Milhau v. Sharp.

17b 435,
13ap289

MILHAU and others *vs.* SHARP and others.

The corporation of the city of New-York has the exclusive right to control and regulate the use of the streets in the city. In this respect it is endowed with legislative sovereignty. And the exercise of that sovereignty has no limit, so long as it is within the objects and trusts for which the power is conferred.

An ordinance *regulating* a street is a *legislative* act, entirely beyond the control of the judicial power of the state.

But a resolution declaring that certain individuals, designated as the associates of the Broadway railroad, shall, upon certain conditions and stipulations therein specified, have the authority and consent of the common council to lay a double track for a railway, in Broadway, and to establish a railway therein, and conferring privileges exclusive in their nature, and designed to be perpetual in their duration, is not a legislative act, regulating the use of the street, but is a grant of the use itself, to the extent specified.

Such a resolution is not within the powers conferred upon the common council, and is therefore void.

The corporation, by such a resolution, assumes to surrender a portion of its municipal authority, and in legal effect agrees with the grantees that, *so far* as they may have occasion to use the street for the purpose of constructing and operating their railroad, the right to regulate and control the use of the street shall not be exercised.

The powers of a municipal corporation may be surrendered; but *it seems* this can be done only by authority of the legislature.

Where the legislature has declared that a municipal corporation shall have the power and authority, from time to time, to regulate the rates of fare to

be charged for the carriage of persons, the corporation has no power to pass a resolution providing that in respect to the carriages which may be employed upon a railroad therein authorized to be constructed, that power shall never be exercised, but that the grantees of such railroad may demand and receive from passengers a certain specified sum.

On the 29th of December, 1852, the board of aldermen of the city of New York adopted a resolution, whereby it was declared that the defendants, and those who might for the time being, be associated with them, designated as the associates of the Broadway railroad, should, upon certain conditions and stipulations therein specified, have the authority and consent of the common council to lay a double track for a railway in Broadway; &c. The resolution was adopted by the board of assistant aldermen on the 30th of December. The associates named in the resolution, on the same day, filed with the clerk of the common council their written acceptance of the resolution, and an agreement on their part to conform to its provisions. The mayor of the city did not concur in the resolution. The plaintiffs brought their action against the persons named in the resolution, to restrain them from entering into or upon Broadway for the purpose of laying or establishing a railway therein, and from digging up, or subverting the soil, or doing any other act in said street tending to encumber the same, or obstruct the free and common use thereof as the same had been enjoyed. It was stated in the complaint that the plaintiffs were severally owners of certain lots of land and premises upon Broadway; and they severally claimed that they were the owners of the land in front of their lots to the center of the street; subject only to the public easement, or right of way over the same. It was further stated that the plaintiffs were all residents and corporators of the city, and had been assessed and had paid taxes upon their said property to a large amount. It was further stated that the defendants, under color of the authority contained in the resolution of the 30th of December, 1852, threatened and gave out that they would enter into and upon Broadway with their workmen and servants, and take up the pavements, and dig up and subvert the soil, and would lay down and establish a railroad in said street,

Milhau *v.* Sharp.

·and run cars thereon, for their own private interest and emolu-
ment, to the great injury and damage of the plaintiffs and other
property owners upon that street ; that if the defendants should
be permitted to take up the pavement in Broadway and establish
a railroad there, the property of the plaintiffs would be seriously
and irreparably injured and.damaged. It was charged that the
resolution and the acceptance thereof were of no binding force
and effect, and conferred no power or authority whatever upon
the defendants to take up the pavement, or establish a railroad
upon Broadway. The conditions and stipulations annexed to
the resolution granting to the defendants authority to construct
their railroad, and the other matters stated in the complaint, are
sufficiently noticed in the opinion of the court. The action was
prosecuted by the plaintiffs on their own behalf, and in behalf of
all other tax payers, citizens and inhabitants of the city, and
owners of property in Broadway. The material allegations in
the complaint; except the adoption of the resolution, were contro-
verted by the defendants. The issues were brought to trial at a
special term, held in the city of New-York in October, 1853. A
great number of witnesses were examined, but as the decision of
the court does not involve an examination of the evidence in
the case, it is unnecessary to state the testimony.

*John Van Buren* and *Henry Hilton,* for the plaintiffs.

*D. D. Field,* for the defendants.

HARRIS, J. Whether the corporation of New-York has an
estate in fee, either absolute or qualified, in the streets of that
city, or a mere right of way, held for the public use, is quite im-
material, for the purposes of this action. In either case, it must
be conceded the corporation has the right of control over the
streets. By the Dongan charter, it was invested with "full
power, license and authority to establish, appoint, order and di-
rect the establishing; making, laying out, ordering, amending
and repairing of all streets, lanes, alleys, highways, &c. in and
throughout the city, necessary, needful and convenient for the

inhabitants of said city, and for all travelers and passengers there." This power has never been withdrawn, or essentially changed. The corporation yet has the exclusive right to control and regulate the use of the streets in the city. In this respect, it is endowed with legislative sovereignty. The exercise of that sovereignty has no limit, so long as it is within the objects and trusts for which the power is conferred. An ordinance regulating a street is a legislative act, entirely beyond the control of the judicial power of the state. But the resolution in question is not such an act. Though it relates to a street, and very materially affects the mode in which that street is to be used, yet, in its essential features, it is a contract. Privileges exclusive in their nature, and designed to be perpetual in their duration, are conferred. Instead of regulating the use of the street, the use itself, to the extent specified in the resolution, is granted to the associates of the Broadway railroad. For what has been deemed an adequate consideration, the corporation has assumed to surrender a portion of their municipal authority, and has, in legal effect, agreed with the defendants that, so far as they may have occasion to use Broadway, for the purpose of constructing and operating their railroad, the right to regulate and control the use of that street shall not be exercised.

That the powers of the corporation may be surrendered, I do not deny; but I think it can only be done by authority of the legislature. Thus, it was provided by the charter of the Hudson River Railroad Company, that its railroad might be located on certain streets of the city of New-York, " provided the assent of the corporation of the city be first obtained." (*Sess. Laws* 1846, *p.* 274, § 4.) Authority to give such assent is implied in the act itself; and the corporation having, in pursuance of such authority, given its assent to the location of the railroad, and the railroad company having located their road accordingly, the assent became irrevocable. The company acquired a right to the use of the streets for the purposes of its road, and, to a corresponding extent, the corporation was deprived of its power to regulate and control the use of the street. So in the case of the Harlem railroad, (*Sess. Laws* 1831, *p.* 327, § 11;) that corporation was

authorized by the legislature to construct their road across or upon any street in the city of New-York, with the consent and approbation of the mayor, &c. of the city. The same provision is found in the general railroad act. (*Sess. Laws* 1850, *p.* 244, § 28, *sub.* 5.) It is thus that the city corporation may, to the extent contemplated by the legislature, restrict its own power to control and regulate streets. (*See Drake* v. *The Hudson River Railroad Company,* 7 *Barb.* 508.) But for the authority derived from the legislature, I am unable to see how a municipal corporation can grant permission to construct a railroad upon one of its streets, which, operating as a contract, and vesting rights in the grantee which cannot be recalled, must limit the power of such corporation to manage and control the use of the streets. I think it cannot be done. It cannot be that powers vested in the corporation as an important public trust can thus be frittered away, or parceled out to individuals, or joint stock associations, and secured to them beyond control. It was asserted by the defendants' counsel upon the trial, that the authority to construct a railroad, conferred upon the defendants by this resolution, may at any time be recalled. If this were so—if the resolution could be regarded as a mere revocable license—it would relieve the case from a fatal difficulty ; for I am not prepared to say that, in the exercise of the discretionary power with which the corporation is endowed, in the management and regulation of streets, it may not authorize an individual or association to lay down a railroad track even in Broadway. But this resolution goes farther ; it authorizes the associates to construct the road, and reserves no right to rescind the grant. It licenses their cars to run upon the road for ten years from the time it shall be opened, at a stipulated fee for each car ; and provides that if the parties fail to agree upon the amount to be paid for licenses, at the expiration of that period the railroad, with all the equipments thereto belonging, shall be surrendered to the corporation at a fair and just valuation. Can it be that a contract containing such provisions may be rescinded at the pleasure of the corporation ? The very contingency, upon the happening of which alone the parties seem to have contemplated

a termination of the contract, furnishes the strongest evidence that the grant was intended to be perpetual.

I agree with Mr. Justice Bosworth, that "it would be an anomaly if, after the grant had been made and accepted, and the road built in every respect in conformity with the terms of such a grant as is contained in the resolution in question, the common council may rescind the grant and divest the rights acquired under it, precisely as they may order a street to be widened or extended, or repeal any police ordinance or regulation." The same view is expressed by Mr. Justice Strong in the opinion delivered by him upon the motion for an injunction in this cause. After referring to the prominent features of the resolution, that learned judge says: "Surely all these provisions indicate something more than a mere revocable license. They convey a valuable right, which, upon the performance of the primary acts required from the defendants, would vest in them, and of which they could not be deprived by a repeal of the resolution."

Mr. Justice Duer, too, in a very able opinion recently delivered by him upon the decision of a kindred action, says: "I am yet to learn that a contract, valid when made, can be rescinded by either of the parties, unless the power of rescinding it is expressly reserved, or was given by some constitutional or statutory provision in force when the contract was made. The licenses contemplated by the resolution must, therefore, be regarded as perpetual and irrevocable. If it takes effect at all, the right of way, now vested in the corporation, so far as it is necessary for the purposes of the defendants, will become vested in them. The exercise of the legislative powers of the corporation, in respect to that street, must be in subordination to the vested rights of the defendants. We have already seen that a corporation cannot, without the consent of the legislature, thus divest itself of its own powers. The resolution itself is, therefore, unauthorized and void."(a)

Again, the corporation has "full power and authority to make and pass such by-laws and ordinances as it shall from time to

(a) The Attorney General and others v. The Mayor of New-York and others, (12 Leg. Obs. 17, 28.)

Milhau *v.* Sharp.

time deem necessary and proper, to regulate hackney coaches or carriages, and their rates of fare or carriage, requiring the owners of such hackney coaches or carriages to have a license from the mayor of the city for the time being, under the directions of the common council. (2 *R. S.* 146, § 272.) It seems to have been assumed by all parties that the cars, which by the terms of the resolution the defendants were authorized to run upon the Broadway railroad, would be "carriages" within the meaning of the term as used in the statute. Accordingly, it is stipulated that the associates shall pay, for ten years from the date of opening their railroad, the annual license fee for each car now allowed by law, and shall have a license accordingly. (*See opinion of Duer, J., above cited; also Drake* v. *Hudson River Railroad Co.,* 7 *Barb.* 508.) Assuming that the cars to be employed by the defendants in operating their railroad would be carriages, and as such would require a license from the mayor of the city, it is extremely questionable whether the corporation had the power to contract beforehand, as they have assumed to do, that for ten years at least such carriages or cars should be licensed. The license is to be given by the mayor of the city for the time being. The execution of this provision in the resolution would require the mayor of the city, whoever he might be, and without any reference to his own judgment or discretion in the case, to issue a license for all the defendants' cars. In stipulating for this, I think the corporation has transcended its authority. But, without insisting further upon this point, I think the more fatal objection upon this branch of the case is, that the corporation has undertaken to deprive itself of the power conferred upon it by the legislature, in the section of the statute above cited, " to regulate rates of fare and carriage."

The associates of the Broadway railroad are, by a provision in their contract with the corporation, authorized to demand and receive from every passenger whom they may carry from one point to another, five cents. Although the legislature has declared that the corporation shall have the power and authority, from time to time, to regulate the rates of fare to be charged for the carriage of persons, the corporation has said, by this resolu-

tion, that in respect to the carriages which may be employed by the defendants in operating their railroad, that power shall never be exercised. This it could not do. The members of the common council, by which this resolution was adopted, were not authorized thus to invade the legislative power of their successors. This objection, in a practical view at least, derives great force from the exclusiveness which is a characteristic feature of the grant. Whether it was intended or not, it is obvious that if the grant takes effect at all, it must operate as a perpetual monopoly. Its privileges are perpetual, or if not, can only be extinguished on the refusal of the grantees to pay such license fee for their cars as the corporation shall exact, and then only upon full indemnity on the part of the corporation. Practically, at least, they are exclusive, too. No one will seriously contend that the corporation would have the power to authorize the use of the defendants' track by any person against their will. And although the abstract right to lay another track might exist, yet, in fact, the thing would be impracticable ; so that the defendants, if they can secure the benefit of their grant, have secured a perpetual monopoly of the privilege of carrying passengers by railroad in Broadway. What if the corporation, for a consideration deemed adequate—as, for the sake of the comparison, the sweeping and cleansing of the street—had granted to the proprietors of a single omnibus line the privilege of running their carriages forever in Broadway, with the right to charge a specified sum as fare ; would any one hesitate to say that the corporation had transcended its power in making such a contract ? Suppose, further, that the fare which the corporation had thus authorized the omnibus proprietors to exact had been ten cents for each passenger, when it was known that other proprietors were willing to perform the same service for six cents, would it not be insisted that, besides going beyond its authority, the corporation had been guilty of a wanton breach of duty ? And then, if the feature of exclusiveness were added to the grant, so that the favored proprietors might enjoy a perpetual monopoly of the carriage of passengers upon Broadway by omnibus, could any tribunal fail to declare the grant illegal and void ? The impropriety of such a grant

Milhau *v.* Sharp.

might be more glaring, but, upon principle, I cannot see that it would be more objectionable, than that under consideration. An attempt has been made to give perpetuity to the association to be formed under the provisions of the resolution, by declaring that, in case any associate should die, or do any act whereby his interest in the association should vest in another, the association should not be deemed to be thereby dissolved, but that the successor in interest should stand in the place of the associate to whose interest he had succeeded. I do not think the object of the parties could be effected in this way. I am not aware of any rule of law which would bind the legal representatives of an associate, in case of death, or the assignee in case of insolvency, to become a stockholder, standing in the place of the associate to whose interest he had succeeded. In such a case I suppose he would have the legal right, as in any other unincorporated association, to have the business closed up and to receive his share of the assets. But whether this is so or not, I cannot see that this provision can vitiate the grant itself. It is in no respect necessary to support the other provisions in the resolution. Though inoperative, as I think it would be, the other provisions in the resolution might very well stand without it, if otherwise unobjectionable. Nor do I think the resolution a violation of the provision in the charter, which requires that contracts for work to be done shall be made by the appropriate head of the executive department. This provision, as I understand it, only relates to contracts which would involve a liability to pay for the work to be done. An agreement, as in this case, to sweep and cleanse a street, not for a compensation to be paid, but as the condition upon which the privileges specified in the contract are granted, may, as it seems to me, very well be made by the common council itself, without the intervention of any of the heads of departments.

Having come to the conclusion that the resolution in question is not within the powers conferred upon the common council, and is, therefore, void, I have not felt myself called upon to examine the questions of fact presented by the pleadings, and to which the evidence presented upon the trial was directed, with the care

which their importance would otherwise require. As to the effect of the proposed railway, a great diversity of opinion evidently exists among the citizens of New-York. A large number of witnesses, among whom are gentlemen in whose judgment on such a subject I should have great confidence, are of opinion that it would be a great public benefit, and in no respect injurious; while quite as many more, upon whose opinions I should quite as willingly rely, think the proposed railway would prove a nuisance not to be endured. Under these circumstances, I should not feel myself justified in declaring that the construction of the road would create what, in legal effect, would amount to a public nuisance; yet I may be permitted to add, I am not without strong apprehension that it would prove greatly injurious to the owners of property, especially in the lower portions of the street. I am inclined to think the weight of the evidence tends to this conclusion.

In respect to the circumstances under which the resolution was adopted, I do not think the evidence would warrant the conclusion that the members of the common council who voted for the resolution were governed by corrupt motives or acted in bad faith. And yet the pertinacity with which they persisted in conferring upon these defendants privileges so extraordinary in their character, and which are supposed at least to be of so very great value, is calculated, it must be conceded, to excite a lively suspicion. Other propositions, apparently more favorable both to the corporation and the public in their terms, were before them. That they should reject these and adopt the proposition of the defendants, can only be accounted for—if the members of the common council who voted for the resolution are to be acquitted of dishonesty—upon the theory assumed by the counsel for the defendants upon the arguments, that they had no confidence in the good faith of those who made the propositions, inasmuch as they were avowedly opposed to the enterprise. But, whatever may have been the motives which induced the members of the common council to support the resolution, they transcended their power, and, therefore, even though it may have been unintentional, were

guilty of a breach of duty. They had no right to make the grant contemplated by the resolution, and, having attempted it, they were chargeable with a violation of official trust.

The only other question which I deem it useful to notice is, whether the plaintiffs are entitled to the remedy for which they ask? The corporation had assumed authority to grant permission to the defendants to lay in Broadway a railroad track. By virtue of such permission, and yet without legal authority, the defendants were about to proceed to the execution of their purpose. The illegal act thus about to be committed would, if consummated, result in special, and perhaps irreparable injury to the plaintiffs, and others, who, like them, are owners of real estate upon Broadway. Besides their interest in common with other corporators and tax payers, they had the other special and more important interest to be affected by what might be done by the defendants under their pretended license from the corporation. Upon this state of facts I cannot doubt that the plaintiffs are entitled to an injunction. The act about to be committed by the defendants was unlawful, but whether it would amount to a public nuisance, may, as the evidence in the case stands, be questionable. But whether a public nuisance or not, it would, I have no doubt, prove injurious to the property of the plaintiffs. If so, whatever the public rights may be, they are entitled to have such unlawful act restrained.

A nuisance may be both public and private. To the individual who has sustained actual damage as the result of the wrongful act, it may be regarded as a private nuisance, even where the party chargeable with such wrongful act might also be convicted of a public nuisance. (*See First Baptist Church* v. *Schenectady and Troy Railroad Company*, 5 *Barb.* 79, *and cases there cited. See also Code, sec.* 219; *Christopher* v. *The Mayor of New-York*, 13 *Barb.* 567.) In the latter case it was held that where an act is clearly illegal, and the necessary effect of such act is to injure the property of another, the court is warranted in restraining the illegal act by injunction. The plaintiffs present such a case. The act sought to be restrained, as we have already seen, is wholly unauthorized, and clearly ille-

gal.    The effect of the act, if committed, would be injurious to the property of the plaintiffs.    I am, therefore, of opinion that the injunction should be made perpetual.

[NEW-YORK SPECIAL TERM, January 3, 1854.   *Harris*, Justice.]