## The Mayor &c. of the City of New York *vs.* The Second Avenue Rail Road Company.

Where the common council of the city of New York enters into a specific agreement with a rail road company, prescribing the regulations to which the latter shall be subject, requiring no further license, and reserving no right to require one, they are concluded by their contract from afterwards passing an ordinance requiring the taking out of a license and the payment of a fee by the company, as a condition precedent to the right to run its cars. Ingraham, J. dissented.

Such an agreement is neither more nor less than a license; and if it confers the right to run cars in a certain manner, through a specified portion of the city, no subsequent enactment can curtail that right.

APPEAL from an order made at a special term, overruling a demurrer to the answer of the defendants.

Clerke, P. J.   This action is brought to recover from the defendants, as owners of a certain rail road car, a penalty of $50 for running it below 125th street without a certificate of license, according to an ordinance of the common council requiring every passenger rail road car, running below that street, to pay into the city treasury annually the sum of $50 " for a license or certificate of such payment to be procured

from the mayor," under the penalty of $50 for every car run contrary to the regulation, to be recovered of the proprietors of the car by the corporation attorney as in case of other penalties.

The defendants set out at length the agreement between their assignors and the corporation, entered into on the 15th December, 1852, by which they were authorized to lay rails in certain streets and to run their cars thereon; and they allege that they have constructed their rail road in pursuance of said agreement; that they have, in all respects, complied with its terms and conditions, and claim that they have full authority under the agreement to run their cars without paying $50 annually for a license. The agreement contains no stipulation on the part of the defendants, or their assignors, to pay any license for running their cars, nor does it require any additional action, or any farther assurance or authority, to enable them to do what this agreement, of itself, expressly and unconditionally permits; unless it may be considered that the resolution of the common council recited in the agreement and made a part of it, imports a liability to pay any sums which the common council may thereafter think proper to impose. This resolution requires that the parties shall, before the permission takes effect, enter into an agreement with the mayor &c. of the city of New York, binding themselves " to abide by and perform the stipulations and provisions therein contained, and also all such other regulations or ordinances as may be passed by the common council relating to the said rail road."

A demurrer to the answer, as not constituting a defense, was overruled at special term.

I. Without, at present, considering the effect of the reservation contained in the resolution above referred to, the first question which presents itself is, whether the corporation could, without such a reservation, require the defendants to take out and pay for a license, after the execution of the agreement.

If an agreement of this kind were entered into, on behalf

of a sovereign state possessing the power of imposing imposts or taxes for the support of government, the mere permission to do a certain thing would not exempt the grantees from liability to any tax to which persons in a similar occupation were made liable, even after the permission were given. All citizens are liable to contribute to the support of the government which protects them; they cannot be exempted from this, except by a special provision of law; and it would be just as reasonable to suppose, because a state conveyed land in fee simple absolute, with full covenants, that it exempted the land from taxation, as to suppose that a permission, like that involved in the present case, exempts the defendants from the payment required, if it was imposed by an authority possessing the taxing power.

But no municipal corporation of the present age, at least in this country and in England, possesses any such power. The supreme legislature of the state could not constitutionally delegate it. The common council has full authority, indeed, by virtue of the charters of James 2 and Queen Ann, to make laws, orders and ordinances for the good will, oversight, correction and government of the city, and may impose and tax reasonable *fines and amercements against and upon all persons offending against such laws, orders* and *ordinances.* It may, consequently, limit and prescribe the rate of speed, designate the stations or places where they should stop, and require them to adopt some method by which their approach may be made known to persons crossing the street; and as it may be indispensable to the public safety and convenience that rail road cars should, like other vehicles, be subject to supervisory regulation, it may ordain that they shall be licensed, and if the company shall neglect to take out the license, that they shall be subject to a penalty. But if the common council enter into a specific agreement with a company, prescribing the regulations to which the latter shall be subject, requiring no further license and reserving no right to require one, I think they are concluded by their con-

tract from afterwards enacting that a license shall be a condition to entitle them to run their cars. This contract is nothing more or less than a license. This does not in any respect gainsay the doctrine laid down in *The Brick Presbyterian Church* v. *The Mayor &c. of New York*, (5 *Cowen*, 538,) and in *Coates* v. *The Mayor &c. of New York*, (7 *id.* 585.) I do not deny that no contract entered into by the corporation can curtail or supersede its action as a legislative body, within the sphere of its legislative powers. But I do deny that the right to establish ordinances &c. for the good rule and government of the city and to provide penalties for their breach, confers any right to impose a tax. In the language of a former counsel of the corporation, I may reiterate that the common council may provide that vehicles of a certain description shall be used, rates of speed may be limited, the particular places in which they shall stop may be designated, and *penalties may be imposed for any breach of these regulations.* This, however, is a very different power from that which provides that vehicles may be run, if a certain sum shall be paid; otherwise they shall not run. This is only a taxing power in the guise of establishing ordinances for good rule and government. Thus, as I have already said, the corporation may ordain that all public vehicles shall be licensed, and if their proprietors shall neglect to take out this license, that they shall be subject to a penalty. But if they ordain that the proprietors shall pay a license fee for the privilege of licensing, and not as a penalty for disobedience, it is an attempted exercise of the taxing power, which no subordinate legislative body under our institutions can possess. The license to run in the present instance had been granted by solemn agreement, and of course, in running pursuant to that license or agreement, the defendants violated no ordinance, so as to have made themselves liable to the imposition of a penalty.

II. Is any such right reserved in the agreement, under consideration, in the present case? A resolution, as we have be-

fore noticed, was passed during the negotiation between the parties, that the assignors of the defendants should bind themselves to abide by and perform the stipulations and provisions contained in the agreement, and "also all such other regulations or ordinances as may be passed by the common council relating to the said road."

Now if the agreement, of itself, confers the right to run in a certain manner through a specified portion of the city, no subsequent enactment can curtail this right. The agreement itself, I repeat, is a license. By this agreement the common council has thought proper to give the defendants liberty, or license, to run their cars. It could not, therefore, have been in the contemplation of either of the parties to the agreement that any further license should be necessary. The license, given by the agreement, was unqualified; and, therefore, the ordinance incorporated into that agreement, by which the defendants are bound to abide by all other regulations or ordinances which may be thereafter passed by the common council, could not have included a regulation or ordinance requiring any additional license. If this was intended, the requirement should be expressed in specific terms.

Preceding the introduction of this resolution, provisions were set forth relative to the mode of laying the rails, keeping the streets in and about them in repair, confining the propelling power to horses, regulating the number of times the cars should be run during the day and between what hours, and providing that they should be run as much oftener as public convenience may require, "under such directions as the common council may from time to time prescribe, also prescribing limits to the rate of fare, and reserving to the corporation the right to regulate the fare for the whole length of the road when completed to Harlem river." Immediately following this comes the resolution that the parties shall in all respects "comply with the directions of the street commissioner and of the common council in the building of the road, and in other matters connected with the regulation of

the road." This is followed by the ordinance, on which I have been commenting; and I have no doubt that the words "other regulations and ordinances," which it contains, meant such ordinances or regulations as the common council might afterwards think necessary for the regulation of the road, in regard to the public safety and convenience, It gives the common council the power, in certain respects, to make further necessary or expedient provisions for the regulation of the road; it by no means imports a right to nullify the license, which the agreement itself gives. It reserved the right, in short, to regulate the mode of running, not to nullify the privilege of running altogether. For this would be the effect of allowing the common council to impose a license fee upon the company; it would be allowing the plaintiffs to say we now order you no longer to run your cars, unless you pay us a heavy fine or penalty, although we have already promised that you should run without requiring the payment of any sum. If they have the right to impose the payment of $50 they have the right to impose any greater sum, which may be so oppressive as to make it no longer worth while to continue running the cars; and thus in effect rescinding the agreement, without any violation of it on the part of the defendants. The power to impose this fine, not being reserved in the agreement, and the common council not having the power to impose a tax, the claim of the plaintiffs is therefore not sustainable. The plaintiffs cannot object to the assignment of the agreement by the original parties, to the defendants. Since the date of the assignment, the defendants have constructed the said road, have in all respects complied with the terms and conditions of the agreement, and, during a period of several years, have been recognized and dealt with by the plaintiffs as the proprietors of the road and the assignees of the original parties.

The order of the special term should be affirmed with costs, and there should be a judgment for the dismissal of the complaint.

Mayor &c. of New York *v.* Second Avenue R. R. Co.

SUTHERLAND, J. I look upon the question raised by the demurrer in this case, as a question of property, of vested rights, resting on or secured by grant or contract.

The resolutions and agreement set up in the defendants' answer were in effect the grant of a valuable franchise or property. The agreement was not only in effect but in form a contract; and the franchise which is the subject of it is as much within the protection of the constitution, as any other property or right resting on, or derived from, contract. (*Dartmouth College* v. *Woodward*, 11 *Wheat.* 511.)

The question of the power of the common council, independent of the state legislature, to make this grant or contract, is not in this case: it is not raised by the demurrer. This action for the penalty of $50, under the ordinance of the 31st December, 1858, affirms, or at least assumes, the right of the defendants to run their cars, and to enjoy, or exercise, the franchise originally granted, by paying the license fees exacted by that ordinance.

The question of the right of the original grantees to assign to the defendants, is not in the case. This action affirms, or at least assumes, the right of the original grantees to assign, for it assumes the present right of the defendants to run their cars under the original grant or contract by paying the license fees and taking out the certificates of license.

The franchise granted is of course held by the defendants, and is to be enjoyed by them, upon the terms and conditions specified in the grant or contract; and I think the question in the case really is, whether, from the grant, contract, or agreement itself, it can fairly be inferred that the plaintiffs intended to reserve the right, thereafter at any time, and from time to time, to impose the payment of these license fees without limitation as to amount, and thus impair, if not utterly destroy, the franchise granted.

But it is suggested that, irrespective of the terms and conditions of the contract, the plaintiffs had a right to impose the payment of these license fees; that the ordinance impos-

ing them was and is an act of legislation; that the plaintiffs cannot grant away their right of legislation; that the grant to the assignors of the defendants of the franchise in question must be presumed to have been made subject to the right thereafter to impose the payment of these license fees as a legislative act; and the cases of *The Brick Presbyterian Church* v. *The Mayor &c.*, (5 *Cowen*, 538,) and of *Coates* v. *The Mayor &c.*, (7 *id.* 585,) are referred to as sustaining this principle.

I do not doubt that grants of property or of franchises, by the city corporation, must be deemed to be made and received subject to the right of future municipal police regulations, the same as if granted by an individual; and this is the principle established by the cases in 5th and 7th Cowen. In the case in 5th Cowen, the ordinance prohibiting the use of the premises as a cemetery was strictly a municipal law or police regulation, authorized by an act of the legislature. But suppose the ordinance, instead of prohibiting the use of the premises as a cemetery, had imposed a license fee of $50 for each body thereafter to be interred in the premises, would the court have held such an ordinance a repeal of the covenant for quiet enjoyment? I think not. No one can fail to see, I think, that such a decision would have done violence to justice and the constitution, by destroying the contract between the parties.

No doubt the grant of a ferry franchise would be deemed to be made subject to such future municipal police regulations or laws as the public safety or health might require. And an ordinance absolutely prohibiting the use of the ferry during the prevalence of an infectious or contagious disease, might be justly held not at all to interfere with the covenant for quiet enjoyment in the lease or grant of the ferry. But would the city corporation, after leasing a ferry for a certain term at a certain rent, have a right to impose a license fee of $50 for each ferry boat used? It is plain it would not, independent of the contract. And yet it appears to me that

Mayor &c. of New York *v.* Second Avenue R. R. Co.

that is the precise question in this case, irrespective of the express terms and conditions of the contract. The distinction must be taken between a general municipal law or ordinance for the public safety or good, and a law (if you choose to so call it) or ordinance for the pecuniary benefit of the city corporation as a legal entity or person capable of granting property, and entering into a contract with reference to it. No doubt the city corporation has power to impose a license fee for the use of public carriages; but the question is whether, after having licensed a public carriage for a certain fee, for a certain term, or for a certain term without the payment of any fee, it has a right during the term to impose the condition of the payment of an additional license fee in the former case, or of any license fee in the latter case, without having reserved such right? Plainly not, if the license is deemed to be a valid subsisting contract.

I presume public lands might in effect be granted by an act of congress or of the state legislature, without the formality of a patent or other instrument. Of course such lands after the grant would be taxable by general laws imposing taxes; but could congress or the state legislature, by a special law impose, as a condition of enjoying the lands so granted, the payment of a certain annual sum of money as rent, or as a tax for the use of the land? I think not, although the act of congress or of the legislature would not be in the form of a grant or contract.

The question whether the plaintiffs, independent of the act of 1854 affirming the grant to the defendants' assignors, had a right to revoke the grant, is not in this case. The right to revoke the grant itself is one thing; the right to affirm it, or at least to assume its existence, and at the same time to impair or destroy its value, is another thing. I am free to say, however, that I do not see upon what principle it could be claimed that the grant could be revoked at the mere will of the corporation.

If the plaintiffs have a right to impose a license fee of $50

for each car, they have a right to impose a license fee of $5000 for each car, and thus they could utterly destroy their own *executed* gift, if no consideration was paid for the grant. Or if a consideration, and a large one, was paid, they could thus, under the form of a license fee, exact such other and further consideration as they saw fit.

I presume that an *executed* gift can no more be revoked or repudiated than a bargain and sale. Besides, if the grant could originally have been called a gift, the defendants under it have built their road, it must be assumed, at large expense, and thus they have a large vested interest under the grant.

Upon the whole, on the grounds which have been above barely suggested, I am of the opinion that the plaintiffs' right to recover in this action must rest exclusively upon the terms and conditions of the written contract; and as I agree with Judge Clerke in his construction of the written contract, I also concur in the conclusion to which he has arrived, that the order of the special term should be affirmed, and the complaint dismissed with costs.

INGRAHAM, J., (dissenting.) The questions argued in this case arise upon a demurrer to the answer of the defendants. The plaintiffs claim to recover a penalty of fifty dollars against the defendants for a violation of the corporation ordinance for licensing rail road cars, which prohibited the running of cars in the city without such license, under such penalty. The answer admits all the facts set up in the complaint, and by way of defense sets up an agreement made between the plaintiffs and Denton Pearsall and others granting them permission to lay the rail road track through the second avenue, in pursuance of resolutions of the common council, and claiming that they have full power to run their cars upon their said rail road without paying any license fee. To this answer the plaintiffs demur.

There is nothing in the resolutions of the common council making the grant, nor in the lease executed in pursuance of

Mayor &c. of New York *v.* Second Avenue R. R. Co.

such resolutions, which specially exempts the defendants from the payment of fees for such licenses, or from the necessity of taking out licenses if required so to do by law. The question, therefore, must be decided upon the broad ground that the corporation have no power to require a license to be taken out in regard to the using of rail road cars. Or that the grant to the parties who originally received it, by not reserving the right to impose such license when required by law, relieved the defendants from any obligation to take out such license even if the common council had authority to require it in other cases.

Upon the first question I think there can be no doubt. It is not to be expected that, in the ancient charters of the city, special references should be made as to modes of conveyances not then in existence or even thought of, but in the Montgomery charter ample provision is made for the passage of all laws, ordinances and statutes which to them shall seem good, useful or necessary for the good rule of the citizens, inhabitants and residents of the said city, and for the further public good, common profit, trade and better government and rule of said city. (*Sec.* 14 *of the Montgomery Charter.*)

The same section also authorized the common council to ordain such penalties as they should think necessary against persons who should offend against such law. The powers granted by this charter in regard to passing laws and ordinances for the good government of the city, have never been taken away or limited by legislative enactments. On the contrary, laws have frequently been passed confirmatory of such powers, or extending them where doubt existed as to the extent of them; and although many of those laws were unnecessary, I know of none in which any attempt was made to take away the powers thus conferred, except so far as the inspection laws on the sale of merchandise, &c. were abrogated by the constitution.

The right to require licenses for public carriages used for the conveyance of passengers, is necessarily embraced in the

powers above referred to. And while the exercise of this power in regard to stages, omnibusses, carriages and other modes heretofore in use is not objected to, I see no good reason why the same should not be extended to rail road cars, simply because they are drawn on rails laid in the streets. The question is as to the power of the common council to require a license, irrespective of the charge, as a mere police regulation. The fee to be charged for it is a mere collateral matter, not affecting the right to require a license.

The other question is, whether the grant of the franchise of laying rails through the second avenue, to the assignors of the defendants, prevents the plaintiffs from passing an ordinance requiring the defendants to take out such license.

I suppose it to be well settled that a corporation in dealing with its property or in making contracts in regard thereto, as well as in making grants of its property or franchises, is only to be regarded as an individual; that all such grants and contracts, when made by them, are to be made subject to the general legislation of the city and of the state, and that it is not necessary in such grants to reserve any right to legislate on subjects connected therewith.

The conveyance of a lot of land by the city to an individual with all the covenants of warranty and quiet enjoyment, does not relieve the owner from paying the taxes which are annually imposed upon it. The conveyance of a house and lot would not prevent the common council from increasing the tax for water to be imposed thereon.

The grant of a ferry franchise would not prevent the common council from any general legislation in regard to ferries which by law is within their powers, although such legislation might operate injuriously to the grantees. The right of the common council thus to legislate, even to the injury of grantees holding under them, has been the subject of adjudication. In the case of *The Brick Presb. Church* v. *The Mayor &c. of New York*, (5 Cowen, 538,) it was held that a grant of land by the corporation for the purpose of a cem-

etery, with a covenant of quiet enjoyment, did not prevent the passage of an ordinance prohibiting interments in that part of the city where the land was situated. Chief Justice Savage says: "In ascertaining their rights and liabilities as a corporation or as an individual, we must not consider their legislative character. Their enactments in their legislative capacity are to have the same effect upon their individual acts as upon those of any other person." The same rule was laid down in *Coates* v. *The Mayor &c.* (7 *Cowen,* 585.)

These cases, however, not only hold that the grant does not prevent the subsequent passage of a by-law at variance with it, but they go farther, and deny the power of the corporation acting in regard to their property to make any grant or covenant which would be at variance with their subsequent legislation.

In the case in 5 *Cowen,* at page 540, Chief Justice Savage says, referring to the corporation, "They had no power as a party to make a contract which should control or embarrass their legislative capacity." So in *Milhau* v. *Sharp,* (17 *Barb.* 435,) Mr. Justice Harris held that a clause in a grant of a rail road giving the right to charge a particular rate of fare, was in violation of the authority conferred upon them to regulate the rates of fare, and says: "The members of the common council, by which this resolution was adopted, were not authorized thus to invade the legislative power of their successors." And in *N. Y. and Harlem R. R. Co.* v. *The Mayor &c. of New York,* (1 *Hilton,* 585,) Hilton, J. says: "The corporation cannot surrender (any power conferred by law) into the hands of private individuals or of a private corporation; and any attempt to do so, without such authority, would be utterly void."

The act of 1854, confirming the grant to the defendants and other grantees under these grants by the common council, was not intended and did not operate to extend the grant beyond the terms of it. It left them still liable and subject to

the general legislation of the city, which did not deprive them of the rights therein granted.

The judgment appealed from should be reversed, and judgment ordered for the plaintiffs on the demurrer, with leave to the defendants to amend their answer on payment of costs.

Order affirmed, with costs.

[NEW YORK GENERAL TERM, February 4, 1861. *Clerke, Ingraham* and *Sutherland,* Justices.]