## SUPREME COURT.

THE MAYOR, &c., of the City of New York agt. THE SECOND AVENUE RAILROAD COMPANY.

Where the *common council of the city of New York*, by resolution and agreement, enter into a *contract* with a railroad company, allowing such company to run their cars through certain streets of the city, prescribing the regulations to which

the latter shall be subject, requiring no further license, and reserving no right to require one, they are *excluded by their contract* from afterwards enacting that a *license* shall be a condition (under a penalty), to entitle the company to run their cars. (*This appears to be adverse to the principles laid down in the preceding case of Britton* agt. *The Mayor, &c., of New York.* INGRAHAM, J., *dissenting, whose views seem to correspond with the case of Britton, supra.*)

*New York General Term, June,* 1861.

*Before* CLERKE, SUTHERLAND and INGRAHAM, *Justices.*

APPEAL, by plaintiffs, from judgment at special term, overruling demurrer to answer.

By the court, CLERKE, P. J.  This action is brought to recover from the defendants, as owners of a certain railroad car, a penalty of fifty dollars for running it below One Hundred and Twenty-fifth street without a certificate of license, according to an ordinance of the common council requiring every passenger railroad car running below that street to pay into the city treasury annually the sum of fifty dollars, "for a license or certificate of such payment, to be procured from the mayor," under the penalty of fifty dollars for every car run contrary to the regulation, to be recovered of the proprietors of the car by the corporation attorney, as in case of other penalties.

The defendants set out at length the agreement between their assignors and the corporation, entered into on the 15th of December, 1852, by which they were authorized to lay rails in certain streets and run their cars thereon; and they allege that they have constructed their railroad in pursuance of said agreement, that they have in all respects complied with its terms and conditions, and claim that they have full authority under the agreement to run their cars without paying fifty dollars annually for a license.

The agreement contains no stipulation on the part of the defendants or their assignors to pay any license for running their cars, nor does it require any additional action, or any further assurance or authority, to enable them to do what this agreement, of itself, expressly and unconditionally per-

mits, unless it may be considered that the resolution of the common council, recited in the agreement and made a part of it, imports a liability to pay any sums which the common council may thereafter think proper to impose. This resolution requires that the parties shall, before the permission takes effect, enter into an agreement with the mayor, &c., of the city of New York, binding themselves "to abide by and perform the stipulations and provisions therein contained, and also all such other regulations or ordinances as may be passed by the common council relating to the said railroad."

A demurrer to the answer as not constituting a defence, was overruled at special term.

I. Without, at present, considering the effect of the reservation contained in the resolution above referred to, the first question which presents itself is, whether the corporation could, without such a reservation, require the defendants to take out and pay for a license after the execution of the agreement.

If an agreement of this kind were entered into, on behalf of a sovereign state possessing the power of imposing imposts or taxes for the support of government, the mere permission to do a certain thing would not exempt the grantees from liability to any tax, to which persons in a similar occupation were made liable, even after the permission were given. All citizens are liable to contribute to the support of the government which protects them; they cannot be exempted from this except by a special provision of law; and it would be just as reasonable to suppose, because a state conveyed land in fee simple absolute, with covenants, that it exempted the land from taxation, that the owner should be thereafter exempted from taxation, as to suppose that a permission like that involved in the present case exempted the defendants from the payment required, if it was imposed by an authority possessing the taxing power.

But no municipal corporation of the present age, at least

in this country and in England, possesses any such power. The supreme legislature of the state could not constitutionally delegate it. The common council has full authority, indeed, by virtue of the charters of James II. and Queen Anne, to make laws, orders and ordinances for the good-rule, oversight, correction and government of the city, and may impose and tax reasonable fines and amerciaments against and upon all persons offending against such laws, orders and ordinances. It may, consequently, limit and prescribe the rate of speed, designate the stations or places where they should stop, and require them to adopt some method by which their approach may be made known to persons crossing the street; and as it may be indispensable to the public safety and convenience, that railroad cars should, like other vehicles, be subject to supervisory regulation, it may ordain that they should be licensed; and if the company should neglect to take out the license, that they should be subject to a penalty. But, if the common council enter into a specific agreement with a company, prescribing the regulations to which the latter shall be subject, requiring no further license, and reserving no right to require one, I think they are excluded by their contract from afterwards enacting that a license shall be a condition to entitle them to run their cars. This contract is nothing more or less than a license.

This does not, in any respect, gainsay the doctrine laid down in the *Brick Presbyterian Church* agt. *The Mayor, &c., of New York* (5 *Cow.*, 538,) and in *Coates* agt. *The Mayor, &c., of New York* (7 *Cow.*, 585.) I do not deny that no contract entered into by the corporation can curtail or supersede its action as a legislative body, within the sphere of its legislative powers. But I do deny that the right to establish ordinances, &c., for the good rule and government of the city, and to provide penalties for their breach, confers any right to impose a tax. In the language of a former counsel of the corporation, I may reiterate that the

NEW YORK PRACTICE REPORTS. 261

Mayor, &c., of New York agt. Second Av. Railroad Co.

common council may provide that vehicles of a certain description shall be used, rates of speed may be limited, the particular places in which they shall stop may be designated, and penalties may be imposed for any breach of these regulations. This, however, is a very different power from that which provides that vehicles may be run, if a certain sum shall be paid; otherwise they shall not run. This is only a taxing power in the guise of establishing ordinances for good rule and government. Thus, as I have already said, the corporation may ordain that all public vehicles shall be licensed, and if their proprietors should neglect to take out this license, that they should be subject to a penalty. But if they ordain that the proprietors shall pay a license fee for the privilege of running, and not as a penalty for disobedience, it is an attempted exercise of the taxing power, which no subordinate legislative body under our institutions can possess. The license to run, in the present instance, had been granted by solemn agreement, and, of course, in running pursuant to that license or agreement, the defendants violated no ordinance, so as to have made themselves liable to the imposition of a penalty.

II. Is any such right reserved in the agreement under consideration in the present case?

A resolution, as we have before noticed, was passed during the negotiation between the parties, that the assignors of the defendants should bind themselves to abide by and perform the stipulations and provisions contained in the agreement, and "also all such other regulations or ordinances as may be passed by the common council relating to the railroad."

Now, if the agreement, of itself, confers the right to run in a certain manner through a specified portion of the city, no subsequent enactment can curtail this right. The agreement itself, I repeat, is a license. By this agreement the common council has thought proper to give the defendants liberty, or license, to run their cars. It could not, there-

fore, have been in the contemplation of either of the parties to the agreement, that any further license should be necessary. The license given by the agreement was unqualified; and, therefore, the ordinance incorporated into that agreement by which the defendants are bound to abide by all other regulations or ordinances, as may be thereafter passed by the common council, could not have included a regulation or ordinance requiring any additional license. If this was intended the requirement should be expressed in specific terms.

Preceding the introduction of this resolution, provisions were set forth relative to the mode of laying the rails, keeping the streets in and about them in repair, confining the propelling power to horses, regulating the number of times the cars should be run during the day, and between what hours, and providing that they should be run as much oftener as public convenience may require, "under such directions as the common council may from time to time prescribe;" also, prescribing limits to the rate of fare, and reserving to the corporation the right to regulate the fare, for the whole length of the road, when completed to Harlem river.

Immediately following this comes the resolution, that the parties shall, in all respects, "comply with the directions of the street commissioner and of the common council, in the building of the road, and in other matters connected with the regulation of the road." This is followed by the ordinance on which I have been commenting; and I have no doubt that the words "other regulations and ordinances," which it contains, meant such ordinances or regulations as the common council may afterwards think necessary for the regulation of the road, in regard to the public safety and convenience. It gives the common council the power, in certain respects, to make further necessary or expedient provisions for the regulation of the road; it by no means

imports a right to nullify the license, which the agreement itself gives.

It reserved the right, in short to regulate the mode of running, not to nullify the privilege of running altogether; for this would be the effect of allowing the common council to impose a license fee upon the company; it would be allowing the plaintiffs to say, We now order you no longer to run your cars unless you pay us a heavy fine or penalty, although we have already promised that you should run without requiring the payment of any sum. If they have the right to impose the payment of fifty dollars, they have the right to impose any greater sum, which may be so oppressive as to make it no longer worth while to continue running the cars, and thus in effect rescinding the agreement, without any violation of it on the part of the defendants. The power to impose this fine not being reserved in the agreement, and the common council not having the power to impose a tax, the claim of the plaintiffs is therefore not sustained. The plaintiffs cannot object to the assignment of the agreement by the original parties, to the defendants. Since the date of the assignment the defendants have constructed the railroad, have, in all respects, complied with the terms and conditions of the agreement, and, during a period of several years, have been recognized and dealt with by the plaintiffs as the proprietors of the road and the assignees of the original parties.

The order of the special term should be affirmed with costs, and there should be judgment of dismissal of the complaint.

SUTHERLAND, J., *concurring.* I look upon the question raised by the demurrer in this case, as a question of property, of vested rights, resting on or secured by grant or contract.

The resolutions and agreement set up in the defendants' answer were, in effect, the grant of a valuable franchise or

property. The agreement was not only in effect, but in form, a contract; and the franchise, which is the subject of it, is as much within the protection of the constitution as any other property or right resting on or derived from contract. (*Dartmouth College* agt. *Woodward*, 11 *Wheaton*, 511.)

The question of the power of the common council, independent of the state legislature, to make this grant or contract, is not in this case; it is not raised by the demurrer. This action for the penalty of. $50, under the ordinance of the 31st of December, 1858, affirms, or at least assumes, the right of the defendants to run their cars, and to enjoy, or exercise, the franchise originally granted, by paying the license fees exacted by that ordinance.

The question of the right of the original grantees to assign to the defendants is not in the case. This action affirms, or at least assumes, the right of the original grantees to assign, for it assumes the present right of the defendants to run their cars under the original grant or contract, by paying the license fees and taking out the certificates of license.

The franchise granted is, of course, held by the defendants, and is to be enjoyed by them, upon the terms and conditions specified in the grant or contract; and I think the question in the case really is, whether from the grant, contract or agreement itself, it can fairly be inferred that the plaintiffs intended to reserve the right, thereafter, at any time, and from time to time, to impose the payment of these license fees without limitation as to amount, and thus impair, if not utterly destroy, the franchise granted.

But it is suggested, that irrespective of the terms and conditions of the contract, the plaintiffs had a right to impose the payment of these license fees; that the ordinance imposing them was and is an act of legislation; that the plaintiffs cannot grant away their right of legislation; that the grant to the assignors of the defendants of the franchise

in question must be presumed to have been made subject
to the right thereafter to impose the payment of those
license fees as a legislative act; and the cases of *The Brick
Presbyterian Church* agt. *The Mayor, &c.*, (5 *Cowen*, 538,)
and of *Coates* agt. *The Mayor, &c.*, (7 *Cowen*, 585,) are re-
ferred to as sustaining this principle.

I do not doubt that grants of property, or franchises by
the city corporation, must be deemed to be made and re-
ceived subject to the right of future municipal police regu-
lations, the same as if granted by an individual; and this
is the principle established by the cases in 5th and 7th
*Cowen.*

In the case in 5th *Cowen*, the ordinance prohibiting the
use of the premises as a cemetery, was strictly a municipal
law or police regulation, authorized by an act of the legis-
lature. But suppose the ordinance, instead of prohibiting
the use of the premises as a cemetery, had imposed a license
fee of fifty dollars for each body thereafter to be interred
in the premises, would the court have held such an ordi-
nance a repeal of the covenant for quiet enjoyment? I
think not. No one can fail to see, I think, that such a
decision would have done violence to justice and the con-
stitution by destroying the contract between the parties.

No doubt the grant of a ferry franchise would be deemed
to be made subject to such future municipal police regula-
tions or laws as the public safety or health might require;
and an ordinance absolutely prohibiting the use of the ferry
during the prevalence of an infectious or contagious dis-
ease, might be justly held not at all to interfere with the
covenant for quiet enjoyment in the lease or grant of the
ferry. But would the city corporation, after leasing a ferry
for a certain term, at a certain rent, have a right to impose
a license fee of fifty dollars for each ferry boat used? It
is plain it would not, independent of the contract. And
yet it appears to me that that is the precise question in

this case, irrespective of the express terms and conditions of the contract.

The distinction must be taken between a general municipal law or ordinance for the 'public safety or good, and a law (if you choose to so call it) or ordinance for the pecuniary benefit of the city corporation as a legal entity or person capable of granting property, and entering into a contract with reference to it. No doubt the city corporation has power to impose a license fee for the use of public carriages; but the question is, whether, after having licensed a public carriage for a certain fee for a certain term, or for a certain term without the payment of any fee, it has a right during the term to impose the condition of the payment of an additional license fee in the former case, or of any license fee in the latter case, without having reserved such rights. Plainly not, if the license is deemed to be a valid subsisting contract.

I presume public lands might in effect be granted by an act of congress, or of the state legislature, without the formality of a patent or other instrument. Of course such lands after the grant would be taxable by general laws imposing taxes. But could congress or the state legislature, by a special law, impose as a condition of enjoying the lands so granted, the payment of a certain annual sum of money as rent, or as a tax, for the use of the land? I think not, although the act of congress or of the legislature would not be in the form of a grant or contract.

The question whether the plaintiffs', independent of the act of 1854, affirming the grant to the defendants' assignors, is not in this case.

The right to revoke the grant itself is one thing; the right to affirm it, or at least to assume its existence, and at the same time to impair or destroy its value, is another thing. I am free to say, however, that I do not see upon what principle it could be claimed that the grant could be revoked at the mere will of the corporation.

If the plaintiffs have a right to impose a license fee or $50 for each car, they have a right to impose a license fee of $5,000 for each car, and thus they could utterly destroy their own executed gift, if no consideration was paid for the grant. Or if a consideration and a large one was paid, they could thus under the form of a license fee exact such other and further consideration as they saw fit.

I presume that an executed gift can no more be revoked or repudiated than a bargain and sale. Besides, if the grant could originally have been called a gift, the defendants under it have built their road, it must be assumed, at large expense, and thus they have a large vested interest under the grant.

Upon the whole, upon the grounds which have been above barely suggested, I am of the opinion that the plaintiffs' right to recover in this action must rest exclusively upon the terms and conditions of the written contract; and as I agree with Judge CLERKE in his construction of the written contract, I also concur in the conclusion to which he has arrived, that the order of the special term should be affirmed and the complaint dismissed with costs.

INGRAHAM, J., *dissenting.* The questions argued in this case arise upon a demurrer to the answer of the defendants.

The plaintiffs claim to recover a penalty of fifty dollars against the defendants for a violation of the corporation ordinance for licensing railroad cars, which prohibited the running of cars in the city without such license, under such penalty.

The answer admits all the facts set up in the complaint, and, by way of defence, sets up an agreement made between the plaintiffs and Denton Pearsall and others, granting them permission to lay the railroad track through the Second avenue, in pursuance of resolutions of the common council, and claiming that they have full power to run their cars upon their said railroad without paying any license fee.

268        NEW YORK PRACTICE REPORTS.

Mayor, &c., of New York agt. Second Av. Railroad Co.

To this answer the plaintiffs demur.

There is nothing in the resolutions of the common council making the grant, nor in the lease executed in pursuance of such resolutions, which specially exempts the defendants from the payment of fees for such licenses, or from the necessity of taking out licenses, if required so to do by law. The question, therefore, must be decided upon the broad ground that the corporation have no power to require a license to be taken out in regard to the using of railroad cars; or that the grant to the parties who originally received it, by not reserving the right to impose such license when required by law, relieved the defendants from any obligation to take out such license, even if the common council had authority to require it in other cases.

Upon the first question I think there can be no doubt. It is not to be expected that in the ancient charters of the city special reference should be made as to modes of conveyances not then in existence, or even thought of; but in the Montgomery charter ample provision is made for the passage of all laws, ordinances and statutes which to them shall seem good, useful or necessary for the good rule of the citizens, inhabitants and residents of the said city, and for the further public good, common profit, trade, and better government and rule of said city. (*Section* 14 *of the Montgomery Charter.*)

The same section also authorized the common council to ordain such penalties as they should think necessary against persons who should offend against such laws.

The powers granted by this charter in regard to passing laws and ordinances for the good government of the city have never been taken away or limited by legislative enactments. On the contrary, laws have frequently been passed confirmatory of such powers, or extending them where doubt existed as to the extent of them; and although many of those laws were unnecessary, I know of none in which any attempt was made to take away the powers thus conferred,

except so far as the inspection laws on the sale of merchandize, &c., were abrogated by the constitution.

The right to require licenses for public carriages, used for the conveyance of passengers, is necessarily embraced in the powers above referred to. And while the exercise of this power in regard to stages, omnibuses, carriages and other modes heretofore in use is not objected to, I see no good reason why the same should not be extended to railroad cars, simply because they are driven on rails laid in the streets. The question is as to the power of the common council to require a license, irrespective of the charge, as a mere police regulation. The fee to be charged for it is a mere collateral matter, not affecting the right to require a license.

The other question is, whether the grant of the franchise of laying rails through the Second avenue to the assignors of the defendants, prevents the plaintiffs from passing an ordinance requiring the defendants to take out such license.

I suppose it to be well settled that a corporation in dealing with its property, or in making contracts in regard thereto, as well as in making grants of its property or franchises, is only to be regarded as an individual; that all such grants and contracts, when made by them, are to be made subject to the general legislation of the city, and of the state, and that it is not necessary in such grants to reserve any right to legislate on subjects connected therewith.

The conveyance of a lot of land by the city to an individual, with all the covenants of warrantee and quiet enjoyment, does not relieve the owner from paying taxes which are annually imposed upon it. The conveyance of a house and lot would not prevent the common council from increasing the tax for water to be imposed thereon.

The grant of a ferry franchise would not prevent the common council from any general legislation in regard to the ferries, which by law is within their powers, although such legislation might operate injuriously to the grantees.

The right of the common council thus to legislate, even to the injury of grantees holding under them, has been the subject of adjudication.

In the case of *The Brick Presbyterian Church* agt. *The Mayor, &c., of New York*, (5 *Cowen*, 538,) it was held that a grant of land by the corporation, for the purpose of a cemetery, with a covenant of quiet enjoyment, did not prevent the passage of an ordinance prohibiting interments in that part of the city where the land was situated. Chief Justice SAVAGE says: "In ascertaining their rights and liabilities as a corporation, or as an individual, we must not consider their legislative character." Their enactments, in their legislative capacity, are to have the same effect upon their individual acts as upon those of any other person. The same rule was laid down in *Coates* agt. *The Mayor, &c.*, (7 *Cowen*, 585.)

These cases, however, not only hold that the grant does not prevent the subsequent passage of a by-law at variance with it, but they go further, and deny the power of the corporation, acting in regard to their property, to make any grant or covenant which would be at variance with their subsequent legislation.

In the case in 5th *Cowen, at page* 540, Chief Justice SAVAGE says, referring to the corporation, "they had no power as a party to make a contract which should control or embarrass their legislative capacity."

So in *Milhau* agt. *Sharp*, (17 *Barb.*, 435,) Mr. Justice HARRIS held that a clause in a grant of a railroad giving the right to charge a particular rate of fare, was in violation of the authority conferred upon them to regulate the rates of fare, and says: "The members of the common council, by which this resolution was adopted, were not authorized thus to invade the legislative power of their successors."

And in *New York & Harlem Railroad Company* agt. *The Mayor, &c., of New York*, (1 *Hilton*, 585,) HILTON, J., says :

" The corporation cannot surrender (any power conferred by law) into the hands of private individuals, or of a private corporation, and any attempt to do so without such authority would be utterly void."

The act of 1854, confirming the grant to the defendants and other grantees under these grants by the common council, was not intended, and did not operate to extend, the grant beyond the terms of it. It left them still liable and subject to the general legislation of the city, which did not deprive them of the rights therein granted.

The judgment appealed from should be reversed and judgment ordered for the plaintiffs on the demurrer, with leave to defendants to amend their answer on payment of costs.