## SUPREME COURT.

The People of the State of New York, David M. Earl and James R. Bartholomew agt. George Law, William Radford, James Murphy and The Ninth Avenue Railroad Company.

The *title* of an owner of a lot of land in the city or country, bounded in general terms by a particular street or highway, extends to the *middle of the street or highway*. He has the entire property in the land subject to the public easement and rights in that portion taken for the street or highway.

Such a right of property in the street the courts are bound to protect, and it cannot be taken from the owner, except for public use, and upon full compensation. Taking it for the purposes of a *railway* is taking it for public use.

Whether, if taken in part for *railroad use*, especially where horses, and not steam, are the motive power, it is anything more than the devotion of it to the same general purposes of passage and locomotion as was the original highway—*quere?*

But where the legislature grant the right or power to construct a railway or other improved mode of locomotion upon a public street, and provide for an *assessment of damages* in taking the title, in case any person shall own any private right or interest in the street, such owner is entitled to compensation, whether it be great or small, for the contemplated appropriation of his interest or property in the street.

If the railway company neglect or refuse to make such compensation, or to provide means to make the same, an *injunction* is proper to prevent the appropriation of the interest of the owner in the street, until compensation is provided.

Where the *people* unite with the individual owners of rights of property in an action to restrain the defendants and their agents from entering into or upon a public street in the city of New York, for the purpose of establishing a railroad thereon, &c., they have no property which is traversed or touched by the line of the proposed railroad, and are not in a situation to require an injunction on that ground. Nor are they the proper representatives of the property rights of the corporation of the city of New York. The corporation must do that for themselves.

*Held,* that the act of April 14, 1860, not only confirmed and made valid the grant or permission conferred by the resolution and action of the common council of the city of New York in reference to the Ninth Avenue Railroad, whether that consent was regular or irregular, and whether it was sufficiently or imperfectly given; but it intended to confer, and did actually confer, an *original grant of power* to construct this railroad, and it has this effect independent of the consent of the common council.

*Held,* also, that the act was not *unconstitutional* by appropriating the public moneys or property to local or private uses. The streets are not *public property* in the same sense intended by the constitution. But the act in not providing for compensation to the *city* in case any of their property is taken, as it does in case the property of private citizens is taken, is invalid and inoperative, if not unconstitutional as to the city, provided the city have such property. But in this case it does not appear that the corporation of the city object to the grant, and do not claim compensation, it probably being assumed that they had given their consent, which had been confirmed by the aforesaid act.

*New York Special Term, November,* 1860.

THIS is an application by the plaintiffs against the defendants for an injunction, and comes on to be heard upon an order granted by Justice INGRAHAM, requiring the defendants to show cause why an injunction should not be granted as prayed for in the complaint, and in the mean time enjoining the defendants and their agents from entering into, or upon that portion of Greenwich street, in the city of New York, which lies between Fulton street and Vesey street, for the purpose of laying, or establishing a railroad therein, or from digging up or subverting the soil, or doing any other act or thing in said streets or either of them, tending to encumber the free and common use thereof, as the same has been heretofore enjoyed, until compensation has been made therefor, pursuant to the provisions of the statute, or until the further order of the court in this action.

The injunction prayed for in the complaint, and sought to be obtained on this motion, is broader than the temporary injunction before granted, and is designed to enjoin the defendants and their agents from entering into or upon or laying or establishing their railroad upon any part either of Greenwich or Washington streets, in the city of New York, and the prayer of the complaint further is, that by the judgment of the court, the injunction may be made perpetual.

The plaintiffs, Earl and Bartholomew, claim to be owners in fee, and in possession of lot number 196 Greenwich street, situated with the building thereon, on the westerly side of Greenwich street, between Fulton and Vesey streets, and extending along Greenwich street twenty-four feet and ten inches. Earl and Bartholomew claim title by a deed from the mayor, aldermen and commonalty of New York, to John Salisbury and Isaac Graham, dated the 8th day of March, 1813, conveying to the grantees therein the lot aforesaid, therein described as " situate, lying and being on the westerly side of Greenwich street," and the easterly boundary is therein stated as follows, to wit : " bounded easterly in front by Greenwich street aforesaid." It is further described as " containing in front on Greenwich street aforesaid, twenty-four feet ten inches," " and in length on the northerly side sixty-one feet six inches."

The same premises were subsequently conveyed to the plaintiffs Earl and Bartholomew. It is claimed on the part of the plaintiffs, that these conveyances give title to the center of Greenwich street, subject to the public easement and rights in the street, and this is one of the controverted points in the case.

A resolution of the common council of New York, originating in 1852, and passed by the board of aldermen on the 22d of March, 1852, amended and passed by the board of assistant aldermen on the 20th of December in the same year, and passed, as amended, by the board of Aldermen,

on the 5th day of January, in the year 1853, vetoed by the mayor of New York on the 12th day of January, 1853, and again passed, over the mayor's veto, by the board of aldermen, on the 14th of November, 1853, and by the board of assistant aldermen on the 18th of December, 1853, said board of assistant aldermen being in 1853 composed of other and different persons than in 1852, granted to James Murphy, William Radford and Minor C. Story, and their respective assigns and associates, the right and privilege to construct a railroad from Fifty-first street through the Ninth avenue, and Gansevoort, Greenwich and Washington streets, to the Battery and Battery place, with certain provisions, limitations and conditions therein contained, one of which was that in no case should steam power be used on any part of said railroad. Story having died, the defendant, George Law, became his executor and personal representative; and said Law, Radford and Murphy are made defendants, as claiming rights and interests under said resolution, and also under an act of the legislature of the state of New York, passed April 14, 1860, to confirm the said grant or resolution of the common council, and to authorize the construction of said railroad.

The Ninth Avenue Railroad Company is a corporation created by the laws of this state, and is made defendant as claiming some right by way of assignment or otherwise, under the said grant or resolution, and under the act of the legislature in question to enter upon Greenwich and Washington streets, for the purpose of laying, establishing and operating a railroad therein.

In an action brought by Apollos R. Wetmore and others against George Law, executor of the last will and testament of Minor C. Story, deceased, and against others, and reported in 22 *Barb.*, 414, the before mentioned resolution and grant were declared inoperative and void, and mainly for the reason that the common council of New York were a local legislature, and could not pass a valid act, ordi-

nance or resolution, unless both boards gave their assent thereto, during the same year in which the same originated.

The act of the legislature of April 14, 1860, before mentioned, purported to confirm and make valid and effectual the grant or permission given, or intended to be given, by the common council of New York, by the resolution aforesaid, and also confirmed all powers, privileges and rights thereby granted or conferred, or intended to be by such grant or resolution, notwithstanding any irregularities. And said act further authorized and empowered the before mentioned persons or their assigns, to lay, construct, operate and run a railroad over, upon and through the avenues, streets and places in said resolution mentioned, together with the necessary turnouts and switches for the proper working of said road. The act further provided, that in case any other person or persons than the mayor, aldermen and commonalty of New York should own any private right or interest in any of said streets or avenues, and there should be an inability to agree for the use of such right or interest for the purposes aforesaid, the right to use the same for such purpose might be acquired under the provisions of the general railroad act of April 2, 1850.

Under the authority of this act and of the resolution aforesaid, the complaint alleged that the defendants entered upon Greenwich and Washington streets aforesaid, took up the pavements and subverted the soil in part, and were continuing to do so, and had taken possession of, laid down and established a railroad over a considerable portion thereof, and threatened further to continue and prosecute the aforesaid acts and proceedings, and to establish and operate said railroad through the entire length of said streets (including the portions belonging to Earl and Bartholomew as aforesaid) without making any compensation therefor, and without paying or providing for the payment to the plaintiffs, or any other property owners, of the damages resulting to them and their property from the taking

of their land and the laying of said railway, and without instituting any proceedings to acquire the right to use said streets or property for the purposes of said railroad, and without making any compensation to the mayor, aldermen and commonalty of the city of New York, for the benefit of the city or of those represented by them. Wherefore they pray for said injunction in behalf of the plaintiffs, and of all other property owners on Greenwich and Washington streets, and of all other citizens and tax payers.

They found their application for the injunction on several grounds : the more material of which are, the alleged invalidity of said resolution, and of the act of the legislalature ; that the streets are under the control of one of the executive departments of the corporation, known as the street department; and the corporation could only act through such department in making the contract, or conferring the authority in said resolution mentioned ; that the construction of said railroad would materially interfere with the use of said streets as highways, and with the business purposes of the adjoining lot owners and occupants, and would be both a public and a private nuisance ; that the power to authorize the construction of said railroad, if possessed by the corporation, is a grant of a franchise which by law must be sold and disposed of at public auction, and to the highest bidder ; or if not so required to be sold by law, said franchise should have been either disposed of at public auction to the highest bidder, in order to subserve the interests of the tax payers and travelers, or else granted to the responsible parties who made voluntary offers to take the same and pay a liberal compensation therefor ; that the grant of the authority conferred by said resolution was a fraud upon the plaintiffs, the citizens and the traveling public, and the passenger fare allowed to be charged thereby was extravagant ; that the consent of the mayor was necessary to said grant or resolution, and that the same is void ; that the people of the state have a public

property and perpetual right of way in said streets; and that the aforesaid act of the legislature is void, inasmuch as it appropriates the public property in said streets for private purposes without having received the assent of two-thirds of the members elected to each branch of the legislature.

W. ALLEN BUTLER, JOHN VAN BUREN and W. CURTIS NOYES, *for plaintiffs.*

CHARLES O'CONOR, C. L. MONELL and H. W. ROBINSON, *for defendants.*

HOGEBOOM, Justice. This application for an injunction is made on behalf of the people, and also on behalf of the plaintiffs, Earl and Bartholomew.

The reasons upon which the application rests are different in the one case from those in the other. I will first consider the question as to the plaintiffs, Earl and Bartholomew.

I think the title of Earl and Bartholomew to the lot claimed by them, which is bounded in general terms by Greenwich street, extends to the middle of the street. Such is certainly the general rule as applied to property having similar boundaries. (3 *Kent's Com.*, 433; *Jackson* agt. *Hathaway,* 15 *John.,* 447; *Hooker* agt. *Utica & Minden Co.,* 12 *Wend.,* 371; *Albany st.,* 11 *Wend.,* 19; *John and Cherry streets,* 19 *Wend.,* 659, 675; *Heywood* agt. *The Mayor,* 3 *Seld.,* 317; *Davis* agt. *Mayor,* 4 *Kern.,* 506; *Williams* agt. *Central R. R. Co.,* 16 *N. Y. R.,* 97; *Imlay* agt. *Union Branch R. R. Co.,* 26 *Conn.,* 249.) And this is so, whether the intervening object between what would otherwise be adjoining land owners, be land or water, a street or a highway, or a stream of water. (*Jackson* agt. *Hathaway,* 15 *John.,* 447; *Adams* agt. *Saratoga & Washington Railroad,* 11 *Barb.,* 414; *Ex parte Jennings,* 6 *Cowen,* 518; *Luce* agt. *Carley,* 24 *Wend.,* 451; *Demeyer* agt. *Legg,* 18 *Barb.,* 14.)

It is conceded to be the rule as to land in the country, and I think it equally applies to urban territory. (*Hammond* agt. *McLachlan*, 1 *Sand. S. C. Rep.*, 323; *Herring* agt. *Fisher*, 1 *id.*, 344; *Adams* agt. *Rivers*, 11 *Barb.*, 390.)

The reason is substantially the same as applied to a road in the country, or a street in the city; that is, the intervening strip was originally taken, or supposed so to be, for public purposes, from the owners on opposite sides of the street or highway, taken only for public purposes, and only so much of it both in regard to the quality and duration of the estate as was supposed to be required for the public use, and is to be returned to the respective proprietors when the public have no further use for it; or else it was founded upon principles of public policy, based upon the supposed inconvenience or impropriety of having so long and narrow a strip of land or body of water the subject of a distinct and separate ownership from that of the adjoining territory on either side. In other words, the owners of the adjoining lands have the entire property in the land, subject to the public easement and rights. It may be true, that as regards land in the city, the use of the public is more extended and comprehensive than in the country. It is wanted not only as a road for purposes of passage and transportation, but also for sewers, for vaults, for gas pipes, for water pipes, and other purposes. But the essential characteristic of both is the same, to wit: the public use or necessity. So also the country may ultimately become a town, the town may become a city; and it would lead to embarrassment if different rules of construction were applied to *country* and to *city* grants, as well as to difficulty in determining when the actual transmutation from country to city property took place. Whether, therefore, we consider the question as one of naked law upon the construction to be given to a legal instrument, or as a rule of evidence to be applied to those instruments for the purpose

of ascertaining the real intentions of the parties, I think the result will be the same.

In determining the question of intention, I do not think the measurement of the lot is at all a controlling consideration. It always yields to the more certain, marked and prominent boundaries and monuments. (*Adams* agt. *Saratoga & Washington R. R. Co.*, 11 *Barb.*, 444; *Hammond* agt. *McLachlan*, 1 *Sand. S. C. Rep.*, 337, 344, 348.) Nor do I regard the fact as of material consequence that the alleged lot owners apply to and obtain from the corporation permission to construct vaults under the streets, and pay for such permission. At most it would indicate the mere opinion of the lot owner as to the extent and effect of his deed, but in reality it merely implies that the owner's right is subject and subordinate to the public easement, and that the latter may require the street portion of the lot for some of the subterranean public purposes before mentioned, to avoid which the previous consent of the public authorities is obtained for the construction of the vaults.

This being so, and the plaintiffs Earl and Bartholomew, having the title to the center of the street, subject only to the public easement, they have a right of property in the streets, which the courts are bound to protect, and which cannot be taken from them, except for public use, and upon full compensation. That taking it for the purposes of a railway is taking it for public use, is settled by repeated adjudications, and can no longer be regarded as an open question. (*Bloodgood* agt. *Mohawk & Hudson Railroad*, 14 *Wend.*, 51, 18 *Wend.*, 9; *Thatcher* agt. *Auburn & Syracuse Railroad*, 25 *Wend.*, 462; *Presbyterian Society in Waterloo* agt. *Auburn & Rochester Railroad*, 3 *Hill*, 567; *Williams* agt. *N. Y. Central Railroad*, 16 *N. Y. Rep.*, 97; *Buffalo & New York Railroad* agt. *Brainerd*, 5 *Seld.*, 100.)

Taking it also for railroad purposes has been adjudged to be a new and distinct use from that of an ordinary street or highway, and, therefore, is not supposed to have

been embraced in the award of damages to the owner, when the same was appropriated to highway purposes. (*Williams* agt. *The New York Central Railroad*, 16 *N. Y. Rep.*, 97.) It is not, perhaps, indispensable to discuss the propriety of this decision. I do not regard it as absolutely binding, except within the range of the facts of that case. That was the case of rail cars propelled by steam; and it has been very gravely debated, and is now the subject of much discussion, whether the appropriation of a highway to a railroad use, especially where horses, and not steam, are the motive power, is anything more than the devotion of it to the same general purposes of passage and locomotion as was the original highway. It is still a devotion of the street or road to highway purposes—to the use of the public. It is impossible to tell precisely to what extent or for what precise purposes it ought to be assumed that compensation was made when the land was originally taken. It was taken for public use, and for the purposes of a highway or street; and yet it has not been doubted that the public authorities might subvert the soil, and lay down sewers, and gas mains, and water pipes, and make vaults and cesspools. I am not aware that, in any of these cases, the public authorities make any additional compensation to private property owners for the apparently new servitude to which the street is thereby devoted. And in all the statutes to which I have referred, incorporating gas or water companies, although provision is made in most of them for compensation for lands taken, yet, when the gas or water pipes are laid in or under a public street, the provision generally, if not universally, is, that they may be so laid with the consent of the municipal authorities, and no provision is made for compensation to the private owners; and yet none of these last named come within the legitimate definition of strictly highway purposes. And when the charters of railway companies allow them to run upon, cut, or intersect the ordinary highways of the country,

which is often done, provision is made for restoring them, as far as may be, to their former grade or usefulness ; but not, so far as I have observed, for making compensation for any interest which the owner of the fee may have in the highway.

The object of a highway is to furnish accommodations for the passage and transportation of travelers and freight. But it has never been said what precise vehicles shall be employed, nor what mode of locomotion adopted. It is conceded that these highways may be used by foot passengers, by the ordinary carts, wagons, carriages and coaches, and they have never been restricted in size. May they not be used by the omnibus and the railroad car ? It is very true the proper use may be regulated, and the excessive size may be restrained by the public authorities. But this is a matter appertaining to the police or good government of the road, and not a matter arising under the question, whether it is an appropriation of private property to new public uses requiring additional compensation. It is worthy, at least, of consideration, whether the partial control and superintendence which the local and state authorities confessedly have over the public and private vehicles which occupy and traverse the streets of a city, and which they may, undoubtedly, exercise for the public convenience and accommodation, and for the security, also, of the rights and property of the individual citizen, has not been sometimes confounded with, or mistaken for the servitude which arises from the appropriation of the street or highway to some novel use, demanding, under the constitution, new compensation to the property owner.

A railroad car drawn by horses, is, in some respects, different from the ordinary vehicles in vogue when the highway was laid out,—that is, it is usually larger and longer—travels in one uniform line upon a grooved surface—and cannot, ordinarily, turn out to accommodate other vehicles which it may meet. At the same time it occupies the

center of the street—is ordinarily out of the way of such vehicles—and its track may, to a considerable extent, be conveniently and advantageously used by the latter. Is it quite clear that this is such a radical departure from the ordinary use of a highway, and productive of such injurious and unforeseen results to property owners along the street, that it requires a new assessment of damages ? May it not properly be considered, in regard to railroad cars moved by horse power, as in the present case, one of those incidents in regard to the use of a public thoroughfare, which must be regarded as within the original contemplation of the parties when the lands were devoted to public use, one of those gradual changes demanded by the increasing wants, prosperity and population of a large city, which must be submitted to by the property owner in deference to the demands of the public ? This is not inconsistent with the imposition of a license fee by the public authorities, or with any other reasonable regulations limiting the use of the street.

It is quite possible, as was suggested in one of the opinions in the Broadway Railroad case, (14 *N. Y. R.*, 520, 531,) that a horse railway might be chartered with authority to the private citizen to run his own car upon the same ; but whether so or not, it is not perfectly apparent to my mind that the devotion of a street or highway in part to the purpose of a horse railroad is such a new or additional use as requires a new assessment of damages.

The case of a steam railway is stronger, because the speed is greater, the danger more imminent, the annoyance more serious, and the interference with the general use of the road more decided. And I do not say that it is not such a new, unusual, and, to some extent, exclusive appropriation of a highway, that it requires a new consent on the part of the property owner, or a new compulsory assessment of damages. It is difficult to lay down any precise test. Perhaps it would be wise to say, that in all cases

where parties are obliged to appeal to the legislature for a grant of the right or power to construct the railway or other improved mode of locomotion, a new assessment of damages should be provided for and made.

In the case under consideration, this has been done. Provision has been made in the act of the legislature in question, for obtaining title in case any person (other than the corporation of New York) shall own any private right or interest in any of the streets or avenues, over or upon which the railroad is authorized to be laid. The legislature has provided this mode of acquiring title. The defendants have accepted the grant with this condition, and must be deemed, therefore, to have conceded that the nature of the improvement called for a new assessment of damages, or to have stipulated to make the same in consideration of the benefits acquired by them under the grant.

I must, therefore, hold, that the plaintiffs are entitled to compensation, whether it be great or small, for the contemplated appropriation of their interest or property in Greenwich street to the public use by this railway company.

If this is so, then the defendants have no right to enter upon their premises, and take their property without first making this compensation or providing means to make the same.

And if they neglect or refuse to do so, then, I think, an injunction is proper to prevent such appropriation, until compensation is provided. For,

1. It is the usual remedy, or one of the usual remedies, and established and recognized by repeated adjudications of our courts. (*Davis* agt. *The Mayor of New York*, 14 *N. Y. R.*, 526 ; *Williams* agt. *N. Y. Central Railroad*, 16 *N. Y. R.*, 97 ; *Attorney General* agt. *Cohoes Company*, 6 *Paige*, 133 ; *Livingston* agt. *Livingston*, 6 *John. Ch. R.*, 497 ; *Wetmore* agt. *Story*, 22 *Barb. R.*, 415 ; *Corning* agt. *Lowerre*, 6 *John. Ch. R.*, 459 ; *Lawrence* agt. *The Mayor, &c.*, 2 *Barb.*, 587.)

2. The taking of this property without compensation, is a palpable act of usurpation, a violation of an absolute property right without pretence of justification, serious in its consequences, permanent in its duration, and in a certain sense of irreparable injury to the proprietors. (*Story's Com. on Eq. Juris.*, §§ 907, 908, 909 ; *Code*, § 219 ; *Benson* agt. *Mayor of New York*, 10 *Barb.*, 226 ; *Davis* agt. *Mayor*, 14 *N. Y. R.*, 506 ; *Milhau* agt. *Sharp*, 17 *Barb.*, 445.)

3. If the injunction is not granted, it will furnish occasion for numberless trespass suits, and involve the parties in perpetual litigation.

4. There are probably other parties along the line of Greenwich and Washington streets similarly situated, and having similar rights of property with the plaintiffs Earl and Bartholomew, and the preventive remedy by injunction will therefore probably save large expense, as well to the defendants as to the plaintiffs and others similarly circumstanced.

My conclusion therefore is, that the temporary injunction was rightfully awarded so far as it applies to the taking of the property of Earl and Bartholomew, and should be continued.

There is no direct evidence before me that it covers a larger frontage on the street than that occupied by the plaintiffs Earl and Bartholomew, though I think it probable that it does so. It is suggested to me that the general term of the first district have decided that in a similar case the injunction might rightfully cover sufficient adjoining territory to protect the injured property owner from the inconvenience and annoyance of the railroad excavations and operations in the immediate vicinity of his premises ; I should myself prefer to restrict it to the property proposed to be actually taken, treating the contemplated action of the defendants as an unwarrantable. invasion of a property right, but in deference to the decision of the general term above mentioned, and in the absence of evidence of

the width of that part of Greenwich street, which lies between Fulton and Vesey streets, and considering also that the extension of the injunction over a few feet more or less of ground, cannot be very material to the defendants, I shall allow the injunction to stand as originally ordered.

The question, however, is a very different one with regard to the other plaintiff, The People. Earl and Bartholomew have no interest in the question of an injunction beyond the protection of their own property and business. The People have no property which is traversed or touched by the line of the proposed railroad; they are not therefore in a situation to require an injunction on that ground. The people, in the characters in which they sue as plaintiffs in this action, are not the individual citizens of the state, but the aggregate body of the public. Nor is the action brought for the benefit of such other persons as will come in and contribute to the expenses of the action. There are therefore no private property rights to protect beyond those of the plaintiffs Earl and Bartholomew, which have been already considered. The people are not here to protect the private property rights of individual citizens; such citizens must protect their own rights. They do not complain.

Nor are the *property* rights of the corporation of New York in question in this action. The people are not the proper representatives of those rights. The corporation must do that for themselves. They are not parties to this suit. If they are aggrieved, they have a right of action, and are capable of prosecuting in their own behalf. It is not for the people to do so.

For the same reason, it appears to me unnecessary to consider whether the grant of the right to construct this railroad is the grant of a franchise, valuable in itself as a property right, and attempted to be disposed of without consideration, or for an insufficient consideration, and in violation of the provisions of the charter. To an action seeking such relief, the corporation is a necessary party

they have a right to be heard. If the injury is done to the rights of the corpration, the corporation is the proper party to seek redress. If done by the corporation, or its authorized agents, the one or the other should be made parties to the action.

The same argument, I think, disposes of all those grounds of relief, based upon the abuse of power by the corporation, or its agents or servants. If the provisions of the charter of New York have been violated—if the common council is incapable of giving a valid consent to, or conferring a legal authority upon the defendants for the construction of this road—if the franchise should be sold at public auction, or disposed of for a more adequate consideration—if the assent of the street department is essential to the validity of the grant—if the resolution has been passed by the common council, without complying with the requisite formalities, or in fraud of the rights of their constituents, or if in any other way abuses or irregularities have crept into the action of the legislative or other agents of the corporation, these questions ought not to be disposed of without hearing the parties whose action is impeached ; and none of them are parties to this suit. I regard that as a sufficient reason for not giving effect to these objections.

But I think there is another effectual answer to these objections : it is, that the defendants' authority to construct this road is not dependent upon the consent of the corporation, but upon the act of the legislature. It is upon that that they rely.

The true and important question, therefore, to be discussed is the validity and effect of the statute in question, passed on the 14th of April, 1860.

It is important then to consider what this act purports and is intended to accomplish, and whether the power thereby conferred has been conferred according to the forms of law, or is liable to any constitutional objections.

In the first place, I think it was intended to confirm and

make valid the grant or permission conferred by the resolution and action of the common council, whether regular or irregular—whether valid or invalid—whether the consent was sufficiently or imperfectly given. It has been said that the consent of the common council was never given according to the forms of law, and that, therefore, it is not proper to assume that its consent was ever intended to be given. But I think this is a fallacy, and that the effect of the act in question is a legislative declaration and adjudication that such consent was intended to be given; and that their confirmation was based upon that assumption, and the action of the common council intended to be validated. This the legislature had the power to do; and I think they have effectually ratified the action of the common council, if the legislative proceedings are free from other valid or constitutional objections.

Some criticism is made upon the effect of confirmation, in a legal point of view; and it is said that " a confirmation may make a voidable or defeasible estate good, but it cannot strengthen a void estate." (*Viners Abr., Con. Y. pl. 5, Co. Lit.*, 295, *b.*) This is true; but it must be considered in reference to the subject-matter. If the common council of New York had no authority to give their consent in any way to the construction of the Ninth Avenue Railroad, a *mere* confirmation of an act thus entirely void and unauthorized, because of want of power over the subject-matter, would probably be of no avail. But if the common council had authority over the subject-matter to express their consent, provided it be done according to established forms, I think the supreme power would have a right to waive or correct a mere irregularity, and by confirmation give effect to an act in other respects legally done. I am inclined to think, also, that there is something of substance in another distinction which may be mentioned. If a *resolution* of the common council, in order to be legally effective, must be passed in a particular way—as by the

action of separate boards thereon in the same year—it may be that the *resolution*, as such, is still defective, notwithstanding its confirmation by the legislature; but if the *grant* or *permission*, which is the subject of the resolution, be such as the common council is authorized to confer, and such grant or permission, though irregularly given, be confirmed by the legislature, it strikes me such confirmation would reach back of and beyond the mere *instrument* by which the grant or permission was conveyed, to the *substance* of the grant or permission itself and make it effective, if the exertion of such a power would be within the scope of the powers of the confirming body.

In addition to this, I regard the act in question as intended to confer, and as actually conferring, an original grant of power to construct this railroad; and that it has this effect independent of the consent of the common council, and that it is effectual in form to accomplish this purpose. I infer this from the tenor of the act itself. The words employed are comprehensive enough to convey this meaning; and it appears to have been the legislative intention to go beyond the simple act of confirmation, and, while preserving to the grantees of the common council all the benefits, and subjecting them to all the liabilities, of the arrangements made between them and the common council, as contracting parties, to confer positive authority, and give legislative sanction, to the construction of this railroad. If so, it comes within the very case put by another elementary writer : " Confirmation is the approbation or consent to an estate already created, which, as far as it is in the confirming power, makes it good and valid. So that the confirmation does not regularly create the estate, yet such words may be mingled in the confirmation *as may create or enlarge an estate*—but that is by the force of such words that are *foreign* to the business of confirmation, and *by their own force and power* tend to create the estate." (*Gilbert's Tenures,* 69.)

I do not see that this is an act of the legislature appropriating the public moneys or property to local or private uses. (*Constitution*, *art.* 1, *sec.* 9.) It is not an appropriation of the public moneys or property. The streets are not *public property* in the same sense intended by the constitution—they do not belong to the state, or the general public. The public, whether a local or general public, have not (if, as the plaintiffs contend, the right of soil is in the adjoining owners) such a property in the streets as was intended by the article of the constitution in question, but only an easement therein, (*Gould* agt. *Hudson River Railroad Co.*, 2 *Seld.*, 547,) nor is the appropriation to *local* or *private* purposes. Railroads have been declared to be public improvements, and taking lands for them it is settled is taking them for a public purpose. (*Bloodgood* agt. *Mohawk & Hudson Railroad Co.*, 18 *Wend.*, 77.)

Inasmuch as compensation is provided for in the act, in case the property of private citizens is taken, I see no ground, as far as they are concerned, for saying that the act is unconstitutional.

The act, however, does not provide for compensation to the city in case any of their property is taken. If they have such property, I think the act is invalid and inoperative, if not unconstitutional, as to them. It does not appear in this case whether they have such property or not. If the corporation have the right of property in the public streets, then, as I have already indicated, in the case of Earl and Bartholomew, assuming this to be a new appropriation of the highway, I regard it as a property right, for which the corporation were entitled to compensation, and of which it was impossible for the legislature to deprive them.

This raises the vexed question, whether in Greenwich and Washington, and in other streets in the lower part of the city, the right of soil is in the corporation of New York, or in the adjoining owners. (*Hoffman's Treatise*, 259; *Mil-*

*hau* agt. *Sharp*, 15 *Barb.*, 193; *Bartow* agt. *Draper*, 5 *Duer*, 130.)

In the view I take of the law in question, and of the constitutional provision, I do not deem it necessary to decide that question.

So far, as appears, the corporation do not object to this grant. They do not claim compensation. It is, probably, assumed, that they have given their consent to the grant to Murphy and others. The validity of this consent depends (mainly at least) upon the question, whether being attested by the passage of the resolution in question by different boards of the common council in different years, it is valid and binding. If it were an open question, I should have some doubt (though I do not express any definite opinion) whether, regarding the board of aldermen and the board of assistant aldermen, as mere agents of a corporation, having continual succession and unending life, it was essential that the same body of agents should continue to be the exponents of its will, through the initiation, progress and consummation of any particular measure, especially as in this case it appears that both boards did assent to the resolution as finally passed in the course of the same year.

But it is not an open question, and has been settled in the contrary way by the decision of the general term of this court, in the case of *Wetmore* agt. *Story*, (22 *Barb.*, 414.)

But assuming that they have not given their consent, I am of opinion that this does not make the act wholly unconstitutional and void, and incapable of confirmation. The corporation may yet give their consent, or they may waive their claim for damages. If so, I think the error is cured. It is a provision exclusively for their benefit, and they may dispense with it if they choose. I think other parties not aggrieved by this omission have not a right to object. The corporation may never claim compensation, and if they do not, I do not see that any other person is injured.

It seems to me it would be an unsound and unauthorized interpretation of this constitutional provision to declare the whole act void for such an omission. The act is not absolutely prohibitory in its terms of compensation to the corporation, but omits to make provision for the latter, doubtless upon the idea that its consent to the grant, though irregularly conferred, was designed to be effectually given. It does not seem, therefore, to be a contemptuous disregard on the part of the legislature of the vested rights of the corporation. I think the erroneous judgment of the legislature in this particular ought not to nullify the whole act.

Even if it be conceded that the people are the legitimate parties to bring to the notice of the courts the unconstitutionality of any law affecting any of the citizens of the state, and to invoke their aid to prevent its execution; yet, inasmuch as it is not averred in the complaint that the fee of the public streets is in the corporation of New York, but, on the contrary, that it is in the owners of the land fronting on the respective sides thereof, I think it would be an unwise exercise of judicial power to subvert the act in question on account of the mere possibility that property rights have been unconstitutionally invaded, without any proof of the fact.

The act then being constitutional and valid, as to all the parties to this suit, it must be sustained and enforced. The railroad in question, thus sanctioned by the highest authority in the state, cannot be a public nuisance, nor is it a private nuisance. It has the stamp of legislative approbation. It must be regarded as a public improvement. The forms of law being complied with, and no constitutional provision infringed, neither individuals nor courts have a right to dispute its binding force.

Nor if it were admissible to inquire into the injurious character of the proposed structure, should I feel disposed upon the evidence before me, and in this stage of the controversy, to pronounce it a nuisance. In a general point of

vièw, whatever may have been the opinion heretofore, railroads can no longer be regarded as possessing that character. Public sentiment is in favor of their authorization and construction to a reasonable extent, and it must be left to the legislature to declare whether the public exigencies demand their establishment.

The proper disposition of this application seems to me to be to continue the injunction heretofore granted, and to refuse its extension beyond the limits therein prescribed.

The costs of the motion should abide the event of the action.