(42 Misc. Rep. 358.)

## MITCHELL v. EINSTEIN et al.

(Supreme Court, Special Term, New York County. January, 1904.)

1. ADVERSE CLAIMS TO REALTY—EVIDENCE.

An action to determine claims to real estate under Code Civ. Proc. § 1638, may be maintained on proof of legal title.

2. QUIETING TITLE.

A person may maintain equitable suit to remove a cloud from title if he is in actual possession.

3. MUNICIPAL CORPORATIONS—ESTABLISHMENT OF HIGHWAY.

Proceedings taken by the city of New York to widen and extend the Bloomingdale Road at about 1795 were taken under the highway act of 1787, c. 61, which appointed the common council commissioners, with power to assess damages.

4. SAME—TITLE ACQUIRED.

The proceedings for the acquisition of the Bloomingdale Road under Laws 1787, c. 61, were for the purpose of acquiring a public road, and an easement for it, and the city neither sought nor acquired the fee of the land in the road.

5. SAME—EASEMENT.

An owner of land on the western side of the Bloomingdale Road, in New York, and other owners of other lands, by a deed, March 24, 1795, released to the city of New York so much of their lands as might be necessary to make the road four rods wide. *Held*, in view of the recitals therein conveying the land for a public road to the city of New York "for the sole and only use of a public road forever," the city acquired only an easement in the road; the fee thereof, subject to such easement, remaining in the grantors.

6. HIGHWAY—ABANDONMENT—RIGHTS OF ABUTTING OWNER.

A grantor in a deed conveyed certain lands to the city of New York for a road, reserving the fee, and retained until his death the land abutting on one side of the road between Ninety-Sixth and Ninety-Seventh Streets, in the present city of New York. The fee in the road passed in partition under a referee's deed in 1856, which by its description covered the land in the road. The road was closed by the commissioners of Central Park, in proceedings taken under Laws 1867, p. 1748, c. 697, in 1868. *Held*, that the fee of the side of the road abutting on the lands of such grantor passed, under section 3, c. 697, p. 1750, of the Laws of 1867, to the purchaser from the referee in partition.

7. SAME.

Where an owner of land gave a city a right of way over the same for a road, reserving the fee, and the abutting land was subsequently partitioned among the heirs of the grantor, and the purchaser at partition in

1860 conveyed the abutting land by a deed, whose description excluded the land on the westerly side of the road, to one S., and he conveyed such land to one K. before 1868, at which time the road was closed by the commissioners of Central Park under Laws 1867, p. 1748, c. 697, *held*, that K., as abutting owner, when the road was closed, had no title to the land on the westerly side thereof, because the city never had the fee thereof, and could not pass it to K. when the road was closed.

**8. DEED—CONSTRUCTION—RIGHTS IN HIGHWAY.**

Where a deed describes certain lots as bounded "easterly in front by the Bloomingdale Road," it conveys the road lying in front of the lots to its center.

**9. SAME.**

A deed of certain lots referred to a map, giving their numbers, and described them as beginning at a point formed by the intersection of the B. Road with the northerly side of Ninety-Sixth street, "thence westerly, thence northerly, thence easterly along the southerly side of Ninety-Seventh street to the westerly side of the B. Road, and thence southerly along the westerly side of it to the point of beginning." *Held* not to convey any part of the road.

Action by Lucy B. Mitchell against David L. Einstein and others. Judgment for defendants.

Charles S. Noyes (David B. Ogden, of counsel), for plaintiff.

Seligman & Seligman (James A. Deering, of counsel), for defendants.

LEVENTRITT, J. This action involves the title to the westerly half of the bed of the old Bloomingdale Road, between Ninety-Sixth and Ninety-Seventh streets. It is conceded that the record title is in the defendants, but it is claimed that facts and circumstances outside the record, and primarily an unrecorded deed produced from the comptroller's office, establish the invalidity of the defendants' title, and the foundation of the plaintiff's claim.

The complaint can be construed in the alternative, as setting up the Code action to determine claims to real property (section 1638), or the classic equity suit to remove a cloud. Preliminary objections are made by the defendants that the action cannot be maintained in either form. I believe the objection unfounded, and that the issue should be determined on its merits. Under the recent authority of Whitman v. City of New York, 85 App. Div. 468, 83 N. Y. Supp. 465, possession is deemed to follow the legal title, and proof of the latter is sufficient to sanction the maintenance of the Code action, while the requirements of the equity suit are satisfied by actual possession at the time of the institution of the action.

In its last analysis, the determination of this action turns upon the construction of an instrument executed in 1795 by landowners along the line of the Bloomingdale Road to the then city of New York. If that instrument be held to convey a fee, then the legal title will be found to be in the plaintiff; if an easement merely, then the legal title is in the defendant. Stripping the case of intermediate questions, we reach the point where the Bloomingdale road was closed under the act creating the Central Park commission. Who was at that time the

¶ 8. See Boundaries, vol. 8, Cent. Dig. § 123.

abutting owner on the westerly side of the road? If the plaintiff's predecessors in title—and they were if the instrument of 1795 passed a fee—then the fee of the bed became vested in those predecessors, and through them in the plaintiff. If the defendant's predecessors in title —and they were if the instrument of 1795 passed an easement—then the fee of the bed became vested in the defendant's predecessors, and through them in him. This instrument of 1795 has never been construed by the courts of this state, so far as I am aware, although I am of the opinion that its construction was necessarily involved in at least one case (De Peyster v. Mali, 92 N. Y. 262), and was indirectly before the lower courts in several others. The instrument itself remained undiscovered in the comptroller's office until the year 1881, and, while in evidence in the De Peyster Case, was not referred to in the opinion. This is the instrument:

"To all to whom these presents shall come:

"Whereas the Mayor, Aldermen and Commonalty of the City of New York have lately laid out, regulated and continued the public highway or Road, commonly called the Bloomingdale Road, of the breadth of four rods, through the lands of James Striker, John Jones, Nicholas De Peyster, James W. De Peyster, John P. Waldron, Andrew McGown, Samuel Kelly and Samuel Bradhurst:

"Now, therefore, know ye that, in order to show the willingness and consent of the said persons respectively above named, that parcel of their respective lands, or so much thereof as may be necessary for the said road of the breadth of four rods, should be taken and held by the said Mayor, Aldermen and Commonalty of the City of New York, for the purpose of a public road as aforesaid. And for and in consideration of the sum of five shillings to the said persons respectively above named paid by the said Mayor, Aldermen and Commonalty of the City of New York, they the said persons above named—to wit, the said James Striker, John Jones, Nicholas De Peyster, James W. De Peyster, John P. Waldron, Andrew McGown, Samuel Kelly and Samuel Bradhurst—have, and each of them doth, for himself, his heirs and assigns, hereby grant, release and forever quitclaim unto the said Mayor, Aldermen and Commonalty of the City of New York, and their successors, all that, the parcel of their respective lands, or so much thereof as may be necessary for the said road of the breadth of four rods as aforesaid; to have and to hold the said parcel of the said respective lands, or so much thereof as may be necessary, for the said public road as aforesaid, with the appurtenances, unto the said Mayor, Aldermen and Commonalty of the City of New York, and their successors to and for the sole and only use of a public road forever.

"In witness whereof, the said James Striker, John Jones, Nicholas De Peyster, James W. De Peyster, John P. Waldron, Andrew McGown, Samuel Kelly and Samuel Bradhurst have hereunto respectively set their hands and seals this twenty-fourth day of March, in the year one thousand seven hundred and ninety-five.

|  |  |
|---|---|
| James Striker. | [L. S.] |
| "John Jones. | [L. S.] |
| "N. De Peyster. | [L. S.] |
| "James W. De Peyster, Jr. | [L. S.] |
| "Jno. P. Waldron. | [L. S.] |
| "A. McGown. | [L. S.] |
| "Saml. Kelly. | [L. S.] |
| "Samuel Bradhurst. | [L. S.] |

"Sealed and delivered in the presence of
"John J. Roosevelt,
"John Jones, Junr."

James Striker, the first signer, was the owner of the premises in question. They formed part of a tract of land known as the "Striker Bay Farm," originally owned, with other lands, by one Theunis Edes,

in 1680, and conveyed to Gerritt Striker, the father of James, by one Apthorp, in 1764.

James Striker died in 1831, leaving by will the farm to the children by his second wife. In 1855 an action in partition was begun by George W. Striker, one of the children of James. On April 25, 1856, a judgment of partition and sale was entered, and Philo T. Ruggles, Esq., was appointed referee to sell. Sale was had on June 11, 1856, the farm being sold in lots with reference to existing streets and the Bloomingdale Road, in accordance with a map on file in the register's office, known as the "Striker Bay Farm Map."

On this map, lot Nos. 251–258, both inclusive, embraced all of the land lying on the westerly side of the Bloomingdale Road, between Ninety-Sixth and Ninety-Seventh streets. By deed dated August 1, 1856, Referee Ruggles sold to John B. Cotte lot Nos. 252–258, inclusive, "which lots when taken together, are bounded and described as follows: Easterly in front by the Bloomingdale Road," southerly by Ninety-Sixth street, and on the other sides by identified lot numbers. On the same day lot 251 was conveyed by him to George H. Peck, which was likewise bounded "easterly in front by the Bloomingdale Road." In 1859 Peck conveyed to Cotte, so that the latter became the owner of the whole block between Ninety-Sixth and Ninety-Seventh streets, bounded easterly in front by the Bloomingdale Road. These several descriptions were all effective to carry whatever title the grantor had in one-half of the bed of the Bloomingdale Road lying in front of the premises conveyed. People v. Law, 34 Barb. 494; Lozier v. N. Y. C. R. Co., 42 Barb. 465; Haberman v. Baker, 128 N. Y. 253, 28 N. E. 370, 13 L. R. A. 611. On March 1, 1860, Cotte conveyed to Richard Sands his eight lots. The description in the deed begins by referring to the Striker Bay Farm map, and identifies the lots as those sold by Ruggles, referee, by the Nos. 251–258, and then continues:

"Which said lots taken together, are bounded and described as follows: Beginning at a point formed by the intersection of the westerly side of the Bloomingdale Road with the northerly side of Ninety-Sixth Street, and running thence westerly along the said northerly side of 96th Street 86 feet and 8 inches, thence northerly and parallel with the Eleventh Avenue 100 feet 11 inches to the centre line of the block, thence easterly along said centre line of the block 25 feet, thence northerly and parallel with the Eleventh Avenue, 100 feet 11 inches to the southerly side of 97th Street, thence easterly along said southerly side of 97th Street 87 feet 8¼ inches to the westerly side of Bloomingdale Road, and thence southerly along the said westerly side of the Bloomingdale Road, 203 feet and 6 inches, to the point of beginning. Together with the right, title and interest of the said parties of the first part, in or to such parts of the strips of land laid out on the said map as public streets called Ninety-Sixth and Ninety-Seventh streets, as lies in front of, or adjoining the said lots hereby granted and conveyed, and extending to the middle of the said streets."

The effect of this description is the subject of some controversy. The authorities, however, are conclusive that the portion of the road lying in front of the premises conveyed did not pass by the deed, but remained in the grantor. Van Amringe v. Barnett, 8 Bosw. 357; Child v. Starr, 4 Hill, 370; Jones v. Cowman, 2 Sandf. 234; Augustine v. Britt, 15 Hun, 395, affirmed in 80 N. Y. 647; Mead v. Riley, 50 N. Y. Super. Ct. 20, affirmed in 102 N. Y. 669; Blackman v. Riley, 138 N. Y. 318, 34 N. E. 214. The case of Augustine v. Britt, relating to

the same property, and where the precise description here involved was construed, would seem to be controlling. Not only does the description begin at a point formed by the intersection of the westerly side of the Bloomingdale Road with the northerly side of Ninety-Sixth street—a point that has been held to be as controlling as any monument, and effectually to exclude the soil of the road (White's Bank v. Nichols, 64 N. Y. 65; English v. Brennan, 60 N. Y. 609; Holloway v. Southmayd, 139 N. Y. 390, 34 N. E. 1047, 1052)—but the last course, running along the side of the road, taken in connection with the point of beginning, is in itself sufficient and controlling (Blackman v. Riley, supra). I do not follow the plaintiff in his argument that there is any ambiguity in this deed from Cotte to Sands, and that therefore parol and extrinsic evidence is admissible to prove that the intent was to include the road. It will not do to say that because a description by lot numbers alone would be held to convey to the center of the street or highway (Bissell v. N. Y. C. R. Co., 23 N. Y. 61; Perrin v. Same, 36 N. Y. 120), this general description, followed by a specific description which plainly excludes the road or street, creates any ambiguity. The specific description controls the general description, and, where the description by lot number is followed by one beginning at the intersecting point of the exterior lines of two streets, this point controls the rest of the description, so that lines running along the streets are confined to the streets' exterior lines, excluding the bed. White's Bank v. Nichols, supra; Fearing v. Irwin, 4 Daly, 385, affirmed in 55 N. Y. 486; Matter of St. Nicholas Terrace, 76 Hun, 209, 27 N. Y. Supp. 765, affirmed in 143 N. Y. 621, 7 N. E. 635; Augustine v. Britt, supra.

But even should the extrinsic evidence be admitted to explain the grantor's intent by showing that Cotte had no other property in the neighborhood, the proof would not be of much avail to the plaintiff. It would not establish the fact that he could not have intended to retain the title to the road in himself. The controlling specific description would still fail to convey the fee of the road. The language of the court in Blackman v. Riley, supra, the facts of which go beyond the requirements of this case, is pertinent:

"It is difficult to conceive of any reason for consciously reserving or failing to convey the roadbed of this road, subject to the public easement. We cannot think it was ever really intended, yet nevertheless we are disposed to hold that, by the language actually used, the grantors in fact failed to convey any portion of the land forming the bed of the road in question." Pages 324, 325, 138 N. Y. page 215, 34 N. E.

It remains, therefore, that whatever title Cotte had in the bed of the Bloomingdale road fronting the premises before the conveyance to Sands was still in him to dispose of after his conveyance to Sands. The plaintiff, who claims only the bed of the old road, therefore, cannot trace his title to that land to Sands, as the latter never had it.

The plaintiff, however, also claims title through a different source, and this brings us to the more serious question of the case. By a series of mesne conveyances, the lands conveyed to Sands became vested in one Martin M. Kellogg, who became the owner thereof on December 14, 1867. The description in these mesne conveyances

was substantially the same as the description in the deed from Cotte to Sands. Some months prior to that time the Legislature, by chapter 697, p. 1748, of the Laws of 1867, created and authorized the board of commissioners of the Central Park to remap the district bounded by 8th avenue, 59th street, 155th street, and the Hudson river. The maps, when filed, were to be final and conclusive, and all streets, roads, etc., within the district not shown or retained on the maps, should, from and after the time of filing of the maps, cease to be public streets or roads. "And the abutting owners on such of said streets * * * and roads as have been opened or ceded, and as shall be abandoned or closed under the provisions of this act, shall . become and be seized in fee simple absolute therein, to the center line thereof in front of his or their lands, respectively." Laws 1867, p. 1750, c. 697, § 3. The commissioners filed their maps on March 7, 1868. The Bloomingdale Road was not shown. The effect of the filing, therefore, was to close the road, and, conceding the validity and constitutionality of the act of 1867, to vest in the abutting owners such title in the road as the city had. If the city had no title to the fee, nothing could vest in the abutting owner, and he would be limited to his recovery for the loss of the easement and the damage resulting from the closing or the change of grade. The ultimate question will thus become, in whom was the fee of the road in front of the premises in question at the time of closing the road? Kellogg was then the owner of the abutting land, and continued so down to April 17, 1877, when he conveyed to one Edwards, through whom, by mesne conveyances, the plaintiff's title is derived. The description from Kellogg to Edwards included all the former's right, title, and interest to the strip of the old road in front of his premises. One year after Kellogg's deed to Edwards, and on March 19, 1878, Cotte, whose conveyance to Sands in 1860 had excluded the road, conveyed the excluded part to William J. Bell; i. e., the westerly half of the old Bloomingdale Road, between Ninety-Sixth and Ninety-Seventh streets—the property which is the subject of this action. The same year Bell conveyed to Clark B. Augustine, and on March 14, 1881, Augustine conveyed to David L. Einstein, the defendant, who has been the record owner since that date.

We need not concern ourselves with the forms of the descriptions in the deeds after the attempted conveyance by Kellogg to Edwards of his right, title, and interest in the road. The crucial question is, who was the owner in fee of the westerly half of the road on March 7, 1868, when it was closed? The deeds through which the plaintiff claims are sufficient to carry the fee, if it vested in Kellogg, pursuant to section 3 of the act of 1867. It is here that we get back to the instrument of 1795. The plaintiff claims that it conveyed a fee to the mayor, aldermen, and commonalty of New York; that that fee was in the corporation when the road was closed; that the westerly half of it then became vested in Kellogg, the abutting owner; and that through Kellogg he derives a perfect title to the premises in question. On the other hand, the defendant claims that the instrument of 1795 was effectual to grant an easement, merely; that the fee remained in Striker, the original grantor, subject merely to the public's right of

way; that the fee to the road, burdened by the easement, passed under the referee's deed in the partition action in 1856; and that when the road was closed, in 1868, the fee, released of the burden, could be, and was, conveyed unincumbered to the defendant's predecessors in title.

I am of the opinion that the instrument of 1795 granted an easement, merely, and that the defendant should prevail in this action. To arrive at its proper intent and effect, it is necessary to consider the nature of the property which the city had in the Bloomingdale Road, and that which it sought to acquire by the proceedings which culminated, in part, in the execution of the instrument in question. The road existed long before 1795. Its beginnings are to be found in early colonial times. So early as 1707, commissioners appointed under an act of 1703 (1 Colonial Laws N. Y., p. 532, c. 131) make a return showing the laying out of a highway over Theunis Edes' land, afterward the Bloomingdale Road. It seems that certainly by 1726 the road was actually opened as a road of the breadth of four rods through Edes' land, and that by 1751 it extended to the house of one Adrian Hoogelandt, located at what is now about 116th street. 3 Colonial Laws N. Y., p. 844, c. 910; Act Nov. 25, 1751. By the act of 1751 just referred to, the hardship resting on the inhabitants along the line of the road, who were few in number, and who were under duty to keep the road in repair, was recognized, and the appointment of a surveyor was provided for, upon whom was cast the duty "to view and survey the said road or highway and lay out the same of the breadth of two rods as the same now runs." The Court of Appeals has held that the act was not merely permissive, but mandatory; that it was justifiable to assume that the surveyor, who was a public officer, performed his duty; that the provisions of the act were in fact carried out; that the road was actually thereafter laid out of the width of two rods only; and that such laying out operated as an abandonment of the user of the other two rods. Blackman v. Riley, 138 N. Y. 318, 326, 327, 34 N. E. 214.

By the act of October 20, 1764 (4 Colonial Laws, p. 838, c. 1268), jurisdiction over the highways in the city and county of New York was vested in the mayor, aldermen, and commonalty of the city, who were appointed commissioners, with authority to widen existing roads and highways to such convenient breadth as they saw fit, not more than four nor less than two rods in width. There is nothing in the record, nor have I been able to find any proceeding on the part of the commissioners under this statute, with reference to the Bloomingdale Road.

By a series of subsequent acts, that of October 20, 1764, was continued in effect until it expired, on January 1, 1777, by the limitation contained in the act of March 9, 1774. 5 Colonial Laws, p. 674, c. 1674. This was the last colonial legislation. We have no further evidence of any proceedings taken with regard to the Bloomingdale Road until about 1791, from which date to 1795 various steps were taken to extend the road northward from De Peyster's barn, which occupied the site of the old Hoogelandt house. These proceedings were all had under the highway act of 1787, c. 61 (2 Valentine's Laws

N. Y. 1176). That act is not to be confused with chapter 88 of the Laws of 1787 (2 Valentine, 1179), which, among other things, had reference to streets. This independent legislation in respect to highways or roads and streets by independent statutes is highly significant. Van Amringe v. Barnett, 8 Bosw. 357, 371. It was the proceedings taken under the highway act of 1787 that culminated in the instrument of 1795. This act, like the colonial act of 1764, appointed the common council commissioners, with essentially similar powers. It was provided that "reasonable satisfaction" be made "for all such lands. as shall be taken and employed," that the commissioners seek to "treat and agree" with the owners, and that upon refusal a precept be issued to the sheriff to impanel a jury before the mayor's court to assess the damages. Section 2. This act was most general in its terms, applying as well to new as to old roads.

It was under this act that the street committee of the common council reported on May 30, 1791, that benefit would result by laying open a new road from Bloomingdale to Ft. Washington. The terminating point of the existing road is given as the De Peyster lands, considerably to the northward of the premises here involved. 10 Min. Common Council, 107. There was lack of unanimity among the persons to be affected by the proposed improvement, for on February 17th and on March 12th two several petitions were presented—one in favor of, and one opposed to, the projected extension. Id. 210, 214. On October 22d a survey was directed to be made of the proposed new portion. Id. 310. On May 14th of the next year the committee on the Bloomingdale Road reported, whereupon it was ordered that the road be opened to its proper legal width to its termination at De Peyster's barn, and thence to the Post Road, if the proprietors would give the land. 11 Min. Common Council, 16. A further committee was appointed to attend to the opening, and to confer with the proprietors. Another order of similar purport, so far as the extension of the road is concerned, was made in the year following. Id. 152. No return or report of the committee is found until July 15, 1795, but on April 7th reference is made in the minutes to what I have called the instrument of 1795, which shows the result of their efforts:

"A release of James Striker, John Jones, Nicholas De Peyster, James W. De Peyster, John B. Waldron, Andrew McGown, Samuel Kelly, and Samuel Bradhurst to this corporation of so much of their respective lands as is required to continue the Bloomingdale Road through the same, of the breadth of four rods, was read, and ordered to be proved and deposited in the clerk's office and recorded." Id. 216.

It would appear from the formal report of the road committee, read and approved on July 15, 1795, that the extension or new road would not require any of the lands of James Striker, the original owner of the premises here in controversy, nor of the lands of John Jones. The report stated that the committee had caused—

"A survey to be made of a continuation of the said road from the place where the ancient road terminated, at the barn of Nicholas De Peyster, which is the place where the dwelling house of Adrian Hoogelandt stood, continued in a northerly direction through and across the lands of the said Nicholas De Peyster, William Molenor, John Waldron, Andrew McGown, John Meyer, Samuel Kelly, and Samuel Bradhurst. That all the said persons, except Wil-

'liam Molenor and John Meyer, have released or are willing to release the said road to the corporation. That your committee have caused particular survey to be made of the land to be taken from the said Molenor and Meyer, and is as follows. * * *" Id. 263.

It will be observed that all the persons named in this report with the exception of Molenor and Meyer executed the instrument March 24, 1795, termed a "release" in the minutes. Proceedings were then had under section 2 of the highway act of 1787, to acquire the necessary rights in Molenor's and Meyer's lands. Precept was issued to the sheriff, a jury was impaneled before the mayor's court to assess the damages, and on September 21, 1795, it was ordered that—

"Mr. mayor issue his warrant on the treasurer to pay William Molenor the sum of fifty-two pounds, and John Meyer the sum of twenty-seven pounds, for the sums assessed by the jury at the mayor's court as recompense and damages for their respective lands taken to continue the Bloomingdale Road."

It appears by a marginal entry that this warrant was issued. 11 Min. Common Council, 288, 289.

This historical outline shows, I think, that the proceedings for the extension and widening of the Bloomingdale Road were had under chapter 61 of the Laws of 1787 (the highway act), and not under chapter 88 of the laws of that year relating to streets; that the sole purpose of the corporation was to improve, widen, and extend a public road, and that all proceedings had that sole object in view; that the scheme was a single and uniform one; and that the interest the corporation sought to acquire was the same as to the lands of all the owners, whatever the method adopted to secure the end. Conceding that the old road was in fact, as it has been held in law, to have been reduced to the width of two rods, under the act of 1751, the one purpose was to secure a highway of the uniform width of four rods; widening the old road to its termination at De Peyster's barn two rods, and laying out thence a new road of the desired breadth. Where the owners would "treat and agree," an instrument expressive of the intention to give the user of the land for the purpose desired was adequate. Where the owners would not, eminent domain proceedings were necessary. In either case it would seem that the city would get a similar title by purchase. Both proceedings were part of one scheme by which the city sought to acquire the same rights for the benefit of its denizens. It is difficult to see any distinction in principle between the title acquired by eminent domain and that by the execution of the most formal deed. The former amounts to a statutory conveyance, "and there is no distinction between such a conveyance and a voluntary conveyance made for a public use." Story v. N. Y. El. R. Co., 90 N. Y. 122, 172, 43 Am. Rep. 146.

What the city sought to acquire was a public road or highway under the act of 1787, and not a street. "Bloomingdale Road was laid out and maintained as a public road or highway, and the legislation with respect to such was different from that under which the city laid out and regulated streets." Deering v. Reilly, 167 N. Y. 184, 192, 60 N. E. 447, 448. Now, the nature of the title acquired in lands taken for a highway or road is quite different from that acquired in lands taken for a street or avenue. In the former case, an easement

only is acquired; in the latter, a fee. Van Amringe v. Barnett, supra; Matter of Lexington Ave., 29 Hun, 303, affirmed in 92 N. Y. 629; Deering v. Reilly, supra. "The distinction seems to be that lands taken for highways in this state are not taken in fee, but an easement only is acquired for the object in view, while lands taken for the purposes of a street or avenue are acquired in fee by the city." Matter of Lexington Avenue, 29 Hun, 305. That an easement only is acquired where lands are taken for highway or road purposes is an elementary proposition that has been insisted on in this state from its earliest organization to the most recent times. 3 Kent, Comm. 432; Cortelyou v. Van Brundt, 2 Johns. 357, 3 Am. Dec. 439; Jackson v. Hathaway, 15 Johns. 447, 8 Am. Dec. 263; Gidney v. Earl, 12 Wend. 98; People v. Kerr, 27 N. Y. 196; Bloomfield Gaslight Co. v. Calkins, 62 N. Y. 386; Deering v. Reilly, supra. "The appropriation of land for the use of a highway is for a specific purpose, and the public thereby acquire a mere right of passage, with the powers and privileges which are incident to such a right. The fee of the land still remains in the owner, and he does not become divested of the title because the public have a free and unrestrained right to the use of the same." Bloomfield Gaslight Co. v. Calkins, 62 N. Y. 388.

In People v. Kerr, supra, the court say:

"In the case of an ordinary highway, all which the state or public obtain by their dedication or opening is said to be an easement of a limited character. All but this remains in the original owner or his assigns, with all its incidents, subject to no restrictions or adverse rights, except this right of passage by the public. * * * Such is the rule which has been applied to all titles acquired by the legislative appropriation of property to public or quasi public uses. Such titles, although given in the broadest and most unqualified language by statutes, are limited to what is needful to effectuate the purpose, and the original owner is deprived of nothing more." 27 N. Y. 196.

Referring now to the instrument of 1795, in the light of these several principles, I think it ought to be evident that what the grantor intended to convey, and what the corporation in fact acquired, was an easement, merely. This so-called release is made with reference to a specific public improvement—one in conception and execution. "Whereas the Mayor, Aldermen and Commonalty * * * have lately laid out, regulated and continued the public highway or road, of the breadth of four rods," etc., is the way the instrument begins, and shows, not a formal deed between parties for a valuable consideration, but a grant in aid of an improvement which, under the statutes then in force, contemplated the acquisition of a mere right of way. "The law will not presume a grant of a greater interest or estate than is essential to the enjoyment of the public easement. The rest is parcel of the close. * * * It follows * * * that the person in possession of the farm or lot through which the highway passes is, in contemplation of law, in possession of the highway, subject to the public easement." Gidney v. Earl, 12 Wend. 99.

After the preliminary recital the instrument continues:

"Now therefore, know ye that, in order to show the willingness and consent of the said persons * * * that parcel of their respective lands, or so much thereof as may be necessary for the said road of the breadth of four rods, should be taken and held by the said Mayor, Aldermen and Commonalty of the City of New York, for the purpose of a public road as aforesaid."

Here, again, the intent is expressed with primary, even sole, reference to the widening and extending of the road. All this precedes the granting clause of the instrument, and all of it shows an obvious intent to grant merely such an interest as was necessary for the purposes in hand. In the absence of any instrument, there could be no possible question, under the authorities, that, no matter how broad or unqualified the language of the statutes, an easement only would have been acquired. How has the instrument given anything more? It was made as the result of a prolonged consideration of a proposed improvement whose object was generally known—certainly to the corporation and the grantors—to acquire such an easement in the highway, as, under existing law, the city could and would take. The city did not seek the fee, and did not require it. The grantors gave with reference to the statute under which the road had been "regulated, laid out and continued." They gave for a nominal consideration. It is difficult to conceive of any reason why they should have intended to give more than that which, under recognized construction of the statutes, the city must be deemed to have intended to take. The owners "grant, release and forever quitclaim" so much of their lands as shall be necessary for the public road. It is given to be held "for the sole and only use of a public road forever." While it is quite true that the habendum clause, standing alone, would not cut down what would otherwise be a grant in fee, or at most a fee upon condition subsequent, yet I think we may here properly refer to the habendum as consistent with, and additionally expressive of, an intent characteristic not only of every part of the instrument, but of the precedent acts leading up to its execution. While the words of the habendum clause, considered alone, cannot, under the cases, be construed as a reservation of any part of the title, they are not to be disregarded when we seek to glean the intent from the entire instrument. If this were a regular, formal deed between parties for a valuable consideration, containing covenants, and passing a fee by the granting clause, then words limiting the use in the habendum would not convert the fee into an easement, but, at most, into a condition subsequent, for the breach of which there would be the right of entry in the grantor or his heirs. Nicoll v. N. Y. & E. R. Co., 12 N. Y. 127; Vail v. Long Island R. Co., 106 N. Y. 283, 12 N. E. 607, 60 Am. Rep. 449; Upington v. Corrigan, 151 N. Y. 143, 45 N. E. 359, 37 L. R. A. 794. Such, however, is not the condition in the case at bar. The habendum does not cut down a grant in fee, but carries out the general intent of the deed.

Indirect support for the general conclusion I have reached is found in the case of Deering v. Reilly, 167 N. Y. 184, 60 N. E. 447.

It has already been pointed out that the title acquired where land is taken in invitum and by voluntary conveyance is to all intents identical. See supra. We have also seen that the proceedings by which the city acquired its rights under the instrument of 1795 were part of the general plan under which the lands of Molenor and Meyer were taken in invitum. Molenor and Meyer owned lands to the north of Striker, and refused to join in the "release" to the city. In Deering v. Reilly the Court of Appeals considered the nature of the title ac-

quired by the city by the proceedings resulting in the assessment of damages before the mayor's court in 1795. In that case there was a stipulation that the city by its proceedings for extending Bloomingdale Road obtained only a right of way over the land taken. Gray, J., however, brushed the stipulation aside, saying: ·

"Even without this stipulation in the case, I do not think that the proceedings to continue and extend Bloomingdale Road over Molenor's lands could be said to have had any other effect than to create an easement over them for the use by the public as a highway. The city acquired an easement only, and not the fee, which it would acquire in the case of lands taken for the purpose of a street or an avenue. * * * Subject to the public's right of way acquired by the city, the title and possession were always in the original owner and his successors in interest." Pages 191, 192, 67 N. Y., page 448, 60 N. E.

I have examined the original record in the Deering Case, and find that the minutes of the common council hereinbefore referred to were before the court, together with the order for the warrant awarding substantial compensation to Molenor and Meyer "for their respective lands taken." This "taking" the Court of Appeals has held to have been the appropriation of an easement merely. If the eminent domain proceedings, pursuant to which Molenor's lands were taken, are held to have resulted in the acquisition of an easement only, I fail to see how the carefully framed instrument of 1795, with its, to me, clearly indicated intent, and its nominal consideration, and made as part of the one uniform scheme to improve and extend the road, should be held to grant something more, and something beyond the requirements or purposes of the city.

The plaintiff seeks to derive comfort from language in Deering v. Reilly, which says:

"Had Molenor conveyed the land to the city for or upon condition that it should be used as a highway, or had the city taken the land by eminent domain, a different question might be presented as to the title when the use of the land as a highway had ceased." Page 193, 167 N. Y. [page 449, 60 N. E.].

In view of the record which was before the court, showing that what was appropriated was taken by eminent domain proceedings, it is clear that the word "land," in the preceding extract, is used as distinguished from "easement." The city did take the easement by eminent domain. What the court held was that those proceedings were ineffectual to give the land in fee.

I am also of the opinion that a construction of the instrument in question as granting an easement, merely, was necessarily involved in the decision of the Court of Appeals in De Peyster v. Mali, 92 N. Y. 262. The instrument was in evidence, but was not mentioned or referred to in the opinion. I deem it unnecessary further to lengthen this memorandum by going into an analysis of the facts of that case. Having argued the question here on principle, I content myself with stating my interpretation of the court's conclusion.

The authorities cited by the plaintiff in support of his claim that a fee was conveyed, I find not applicable. I have considered them all with care; going to the original records, where available, to examine the respective deeds. They are generally distinguished on the broad principle of intent. A word more may be said as to the two authorities on which he chiefly relies. Nicoll v. N. Y. E. R. Co., supra,

was a grant to a private corporation. Obviously, there is a distinction between a grant to a private corporation and to a public municipality acquiring an interest in lands under statutes that have been construed to contemplate the taking of an easement only. In Vail v. Long Island R. Co., supra, there was the clearest intent to convey a fee. There was a formal deed, the same as between any two private parties, for a valuable consideration expressly stated, and there were the usual covenants of warranty. There were no recitals showing a contrary intent, and the sole point relied on was that in the habendum clause the use was stated to be for a highway only. That under such circumstances the habendum alone could not cut down the fee, I have already pointed out. There was absolutely nothing else in the deed to indicate intent. There were no preliminary recitals, nor previous history, nor other surrounding facts and circumstances which in any wise indicated an intent to limit a fee plainly granted in terms.

There should be judgment in favor of the defendant, dismissing the complaint of the plaintiff.

Judgment accordingly.